LORANCE ET AL. *v.* AT&T TECHNOLOGIES, INC., ET AL.

No. 87–1428.   Argued March 20, 1989—Decided June 12, 1989

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, and KENNEDY, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 913. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 913. O'CONNOR, J., took no part in the consideration or decision of the case.

*Barry Goldstein* argued the cause for petitioners. With him on the briefs were *Julius LeVonne Chambers, Bridget Arimond,* and *Patrick O. Patterson.*

*Charles A. Shanor* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Ayer, Richard J. Lazarus, Gwendolyn Young Reams,* and *Donna J. Brusoski.*

*David W. Carpenter* argued the cause for respondents. With him on the brief were *Rex E. Lee, Patrick S. Casey, Gerald D. Skoning, Charles C. Jackson, Michael H. Gottesman, Robert M. Weinberg, Joel A. D'Alba,* and *Stephen J. Feinberg.*\*

JUSTICE SCALIA delivered the opinion of the Court.

Respondent AT&T Technologies, Inc. (AT&T), manufactures electronics products at its Montgomery Works plant. The three petitioners, all of whom are women, have worked as hourly wage employees in that facility since the early 1970's, and have been represented by respondent Local 1942, International Brotherhood of Electrical Workers, AFL–CIO. Until 1979 all hourly wage earners accrued competitive seniority exclusively on the basis of years spent in the plant,

---

\**Robert E. Williams, Douglas S. McDowell,* and *Katrina Grider* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

and a worker promoted to the more highly skilled and better paid "tester" positions retained this plantwide seniority. A collective-bargaining agreement executed by respondents on July 23, 1979, altered the manner of calculating tester seniority.[1] Thenceforth a tester's seniority was to be determined not by length of plantwide service, but by time actually spent as a tester (though it was possible to regain full plantwide seniority after spending five years as a tester and completing a prescribed training program). The present action arises from that contractual modification.

Petitioners became testers between 1978 and 1980. During a 1982 economic downturn their low seniority under the 1979 collective-bargaining agreement caused them to be selected for demotion; they would not have been demoted had the former plantwide seniority system remained in place. Claiming that the present seniority system was the product of an intent to discriminate on the basis of sex, petitioners filed complaints with the Equal Employment Opportunity Commission (EEOC) in April 1983. After the EEOC issued right-to-sue letters, petitioners in September 1983 filed the present lawsuit in the District Court for the Northern District of Illinois, and sought certification as class representatives for women employees of AT&T's Montgomery Works plant who had lost plantwide seniority or whom the new system had deterred from seeking promotions to tester positions. Their complaint alleged that among hourly wage earners the tester positions had traditionally been held almost exclusively by men, and nontester positions principally by women, but that in the 1970's an increasing number of women took the steps necessary to qualify for tester posi-

---

[1] The type of seniority at issue here is not "benefit seniority," which is used to "compute *noncompetitive* benefits earned under the contract of employment," *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 766 (1976) (emphasis added), but "competitive seniority," which is "used to allocate entitlements to scarce benefits" such as promotion or nondemotion, *id.*, at 766–767.

tions and exercised their seniority rights to become testers. They claimed that the 1979 alteration of the rules governing tester seniority was the product of a "conspir[acy] to change the seniority rules, in order to protect incumbent male testers and to discourage women from promoting into the traditionally-male tester jobs," and that "[t]he purpose and the effect of this manipulation of seniority rules has been to protect male testers from the effects of the female testers' greater plant seniority, and to discourage women from entering the traditionally-male tester jobs." App. 20, 21–22.

On August 27, 1986, before deciding whether to certify the proposed class, the District Court granted respondents' motion for summary judgment on the ground that petitioners had not filed their complaints with the EEOC within the applicable limitations period.[2]    44 FEP Cases 1817, 1821. A divided panel of the Court of Appeals for the Seventh Circuit affirmed, concluding that petitioners' claims were time barred because "the relevant discriminatory act that triggers the period of limitations occurs at the time an employee becomes subject to a facially neutral but discriminatory seniority system that the employee knows, or reasonably should know, is discriminatory." 827 F. 2d 163, 167 (1987). We granted certiorari, 488 U. S. 887 (1988), to resolve a Circuit conflict on when the limitations period begins to run in a lawsuit arising out of a seniority system not alleged to be discriminatory on its face or as presently applied. Compare, *e. g.,* case below with *Cook* v. *Pan American*

---

[2] Under 42 U. S. C. § 2000e–5(e), a charge must be filed with the EEOC within 180 days of the alleged unfair employment practice unless the complainant has first instituted proceedings with a state or local agency, in which case the period is extended to a maximum of 300 days.   Neither the District Court nor the Court of Appeals ruled on the applicable limitations period in the present case, since both courts concluded that petitioners' claims were time barred even if the applicable period was 300 days.   See 827 F. 2d 163, 165, and n. 2 (CA7 1987).   We may for the same reason avoid ruling on that point here.

*World Airways*, 771 F. 2d 635, 646 (CA2 1985), cert. denied, 474 U. S. 1109 (1986).

Section 706(e) of Title VII of the Civil Rights Act of 1964, 78 Stat. 260, as amended, provides that "[a] charge . . . shall be filed [with the EEOC] within [the applicable period] after the alleged unlawful employment practice occurred." 42 U. S. C. § 2000e–5(e). Assessing timeliness therefore "requires us to identify precisely the 'unlawful employment practice' of which [petitioners] complai[n]." *Delaware State College* v. *Ricks*, 449 U. S. 250, 257 (1980). Under § 703(a) of Title VII, it is an "unlawful employment practice" for an employer

"(1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a).

Petitioners' allegation of a disparate impact on men and women would ordinarily suffice to state a claim under § 703 (a)(2), since that provision reaches "practices that are fair in form, but discriminatory in operation," *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971); see *Connecticut* v. *Teal*, 457 U. S. 440, 446 (1982). "[S]eniority systems," however, "are afforded special treatment under Title VII," *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 81 (1977), by reason of § 703(h), which states:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of com-

pensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ." 42 U. S. C. § 2000e–2(h).

We have construed this provision to mean that "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Hardison, supra,* at 82; see *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 65, 69 (1982). Thus, for liability to be incurred "there must be a finding of actual intent to discriminate on [statutorily proscribed] grounds on the part of those who negotiated or maintained the [seniority] system." *Pullman-Standard* v. *Swint,* 456 U. S. 273, 289 (1982).

Petitioners do not allege that the seniority system treats similarly situated employees differently or that it has been operated in an intentionally discriminatory manner. Rather, they claim that its differential impact on the sexes is unlawful because the system "ha[d] its genesis in [sex] discrimination." *Teamsters* v. *United States,* 431 U. S. 324, 356 (1977). Specifically, the complaint alleges that respondents "conspired *to change* the seniority rules, in order to protect incumbent male testers," and that the resulting agreement effected a *"manipulation of* seniority rules" for that "purpose." See App. 20–22 (emphasis added). This is in essence a claim of intentionally discriminatory *alteration* of their contractual rights. Seniority is a contractual right, Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1533 (1962), and a competitive seniority *system* establishes a "hierarchy [of such rights] . . . according to which . . . various employment benefits are distributed," *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 768 (1976). Under the collective-bargaining agreements in effect prior to 1979, each petitioner had earned the

right to receive a favorable position in the hierarchy of seniority among testers (if and when she became a tester), and respondents eliminated those rights for reasons alleged to be discriminatory. Because this diminution in employment status occurred in 1979—well outside the period of limitations for a complaint filed with the EEOC in 1983—the Seventh Circuit was correct to find petitioners' claims time barred under § 706(e).

We recognize, of course, that it is possible to establish a different theoretical construct: to regard the employer as having been guilty of a continuing violation which "occurred," for purposes of § 706(e), not only when the contractual right was eliminated but also when each of the concrete effects of that elimination was felt. Or it would be possible to interpret § 703 in such fashion that when the proviso of § 703(h) is not met ("provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin") and that subsection's protection becomes unavailable, nothing *prevents* suits against the later effects of the system *on disparate-impact grounds* under § 703(a)(2). The answer to these alternative approaches is that our cases have rejected them.

The continuing violation theory is contradicted most clearly by two decisions, *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980), and *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977). In *Ricks*, we treated an allegedly discriminatory denial of tenure—rather than the resulting nondiscriminatory termination of employment one year later—as the act triggering the limitations period under § 706(e). Because Ricks did not claim that "the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure," we held that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks." 449 U. S., at

258. "That is so," we found, "even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later." *Ibid.* (emphasis in original). We concluded that "'[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful.'"[3] *Ibid.* (emphasis in original); accord, *Chardon* v. *Fernandez,* 454 U. S. 6, 8 (1981) *(per curiam).*

In *Evans,* United Air Lines had discriminatorily dismissed the plaintiff after she had worked several years as a flight attendant, and when it rehired her some years later, gave her no seniority credit for her earlier service. Evans con-

---

[3] The dissent attempts to distinguish *Delaware State College* v. *Ricks* on the ground that there "[t]he allegedly discriminatory denial of tenure . . . served notice to the plaintiff that his termination a year later would come as a 'delayed, *but inevitable,* consequence.'" *Post,* at 917 (emphasis in original; citation omitted). This builds on its earlier criticism that "[o]n the day AT&T's seniority system was adopted, there was no reason to believe that a woman who exercised her plantwide seniority to become a tester would *ever* be demoted as a result of the new system," so that at that point the prospect of petitioners' suffering "concret[e] harm" was "speculative." *Post,* at 914 (emphasis in original). Of course the benefits of a seniority system, like those of an insurance policy payable upon the occurrence of a noninevitable event, are by their nature speculative—if only because they depend upon the employee's continuing desire to work for the particular employer. But it makes no more sense to say that no "concrete harm" occurs when an employer provides a patently less desirable seniority guarantee than what the law requires, than it does to say that no concrete harm occurs when an insurance company delivers an accident insurance policy with a face value of $10,000, when what has been paid for is a face value of $25,000. It is true that the injury to the employee becomes substantially *more* concrete when the less desirable seniority system causes his demotion, just as the injury to the policyholder becomes substantially more concrete when the accident occurs and the payment is $15,000 less than it should be. But that is irrelevant to whether there was *any* concrete injury at the outset. What the dissent means by "concrete harm" is what *Ricks,* 449 U. S., at 258, referred to as the point at which the injury becomes "most painful"—and that case rejected it as the point of reference for liability. Accord, *Chardon* v. *Fernandez,* 454 U. S. 6, 8 (1981) *(per curiam).*

ceded that the discriminatory dismissal was time barred, but claimed that the seniority system impermissibly gave "present effect to a past act of discrimination." 431 U. S., at 558. While agreeing with that assessment, we concluded under § 703(h) that "a challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer." *Id.*, at 560. Like Evans, petitioners in the present case have asserted a claim that is wholly dependent on discriminatory conduct occurring well outside the period of limitations, and cannot complain of a continuing violation.

The second alternative theory mentioned above would view § 703(h) as merely providing an affirmative defense to a cause of action brought under § 703(a)(2), rather than as making intentional discrimination an element of any Title VII action challenging a seniority system. The availability of this affirmative defense would not alter the fact that the claim asserted is one of discriminatory impact under § 703(a)(2), causing the statute of limitations to run from the time that impact is felt. As an original matter this is a plausible, and perhaps even the most natural, reading of § 703(h). (We have construed § 703(e), 42 U. S. C. § 2000e-2(e)—which deals with bona fide occupational qualifications—in this fashion. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 333 (1977).) But such an interpretation of § 703(h) is foreclosed by our cases, which treat the proof of discriminatory intent as a necessary element of Title VII actions challenging seniority systems. At least as concerns seniority plans, we have regarded subsection (h) not as a defense to the illegality described in subsection (a)(2), but as a provision that itself "delineates which employment practices are illegal and thereby prohibited and which are not." *Franks*, 424 U. S., at 758. Thus, in *American Tobacco Co.* we determined § 703(h) to mean that "the fact that a seniority system has a discriminatory impact is not

alone sufficient to invalidate the system; actual intent to discriminate *must be proved.*" 456 U. S., at 65 (emphasis added). "To be cognizable," we held, "a claim that a seniority system has discriminatory impact *must* be accompanied by proof of a discriminatory purpose." *Id.*, at 69 (emphasis added); accord, *Pullman-Standard*, 456 U. S., at 277, 289; *Hardison*, 432 U. S., at 82. Indeed, in *California Brewers Assn.* v. *Bryant*, 444 U. S. 598 (1980), after deciding that a challenged policy was part of a seniority system, we noted that on remand to the District Court the *plaintiff* would "remain free to show that . . . the seniority system . . . is not 'bona fide' or that the differences in employment conditions that it has produced are 'the result of an intention to discriminate because of race,'" *id.*, at 610–611. Thus, petitioners' claim depends on proof of intentionally discriminatory adoption of the system, which occurred outside the limitations period.

That being the case, *Machinists* v. *NLRB*, 362 U. S. 411 (1960), establishes that the limitations period will run from the date the system was adopted (at least where the adoption occurred after the effective date of Title VII, and a cause of action against it was available). *Machinists* was a decision under the National Labor Relations Act (NLRA), but we have often observed that the NLRA was the model for Title VII's remedial provisions, and have found cases interpreting the former persuasive in construing the latter. See *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 226, n. 8 (1982); *Teamsters*, 431 U. S., at 366; *Franks, supra,* at 768–770; *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 419 (1975). Such reliance is particularly appropriate in the context presented here, since the highly unusual feature of requiring an administrative complaint before a civil action can be filed against a private party is common to the two statutes. The NLRA's statute of limitations—which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with

the Board," 29 U. S. C. § 160(b)—is even substantively similar to § 706(e)—which states that "[a] charge . . . shall be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred," 42 U. S. C. § 2000e–5(e). In *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385 (1982), we specifically relied on cases construing the NLRA's timely filing requirement in determining whether § 706(e)—the very provision we construe here—constituted a waivable statute of limitations or rather a jurisdictional prerequisite to a Title VII action. "Because the time requirement for filing an unfair labor practice charge under the National Labor Relations Act operates as a statute of limitations subject to recognized equitable doctrines and not as a restriction of the jurisdiction of the National Labor Relations Board," we said, "the time limitations under Title VII should be treated likewise." 455 U. S., at 395, n. 11 (citations omitted).

*Machinists* considered and rejected an approach to the limitations period identical to that advanced here. The suit involved the timeliness of an unfair labor practice complaint directed at a so-called "union security clause," which required all employees to join the union within 45 days of the contract's execution. Under the NLRB's precedents, agreeing to such a clause when the union lacked majority status constituted an unfair labor practice, as did continued enforcement of the clause. 362 U. S., at 413–414. The agreement at issue in *Machinists* had been *adopted* more than six months before the complaint issued (outside the limitations period), but had been *enforced* well within the period of limitations. "Conceding that a complaint predicated on the *execution* of the agreement here challenged was barred by limitations," the NLRB contended that "its complaint was nonetheless timely since it was 'based upon' the parties' continued *enforcement*, within the period of limitations, of the union security clause." *Id.*, at 415 (emphasis in original). We found,

however, that "the entire foundation of the unfair labor practice charged was the Union's time-barred lack of majority status when the original collective-bargaining agreement was signed," and that "[i]n the absence of that fact enforcement of this otherwise valid union security clause was wholly benign." *Id.*, at 417. "[W]here a complaint based upon that earlier event is time-barred," we reasoned, "to permit the event itself" "to cloak with illegality that which was otherwise lawful" "in effect results in reviving a legally defunct unfair labor practice." *Ibid.*[4] This analysis is squarely in point here. Because the claimed invalidity of the facially nondiscriminatory and neutrally applied tester seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, it is the date of that signing which governs the limitations period.

In holding that, when a seniority system is nondiscriminatory in form and application, it is the allegedly discriminatory *adoption* which triggers the limitations period, we respect not only § 706(e)'s general " 'value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale [claims],' " *Ricks*, 449 U. S., at 260 (citation omitted), but also the considerations underlying the "special treatment" accorded to seniority systems under § 703(h), see

---

[4] Like *Ricks* and *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), our decision in *Machinists* v. *NLRB* also rejected an attempt to cure untimeliness by asserting a continuing violation:

"The applicability of these principles cannot be avoided here by invoking the doctrine of continuing violation. It may be conceded that the continued enforcement, as well as the execution, of this collective bargaining agreement constitutes an unfair labor practice, and that these are two logically separate violations, independent in the sense that they can be described in discrete terms. Nevertheless, the vice in the enforcement of this agreement is manifestly not independent of the legality of its execution, as would be the case, for example, with an agreement invalid on its face or with one validly executed, but unlawfully administered." 362 U. S., at 422–423.

*Hardison,* 432 U. S., at 81. This "special treatment" strikes a balance between the interests of those protected against discrimination by Title VII and those who work—perhaps for many years—in reliance upon the validity of a facially lawful seniority system. There is no doubt, of course, that a facially discriminatory seniority system (one that treats similarly situated employees differently) can be challenged at any time,[5] and that even a facially neutral system, if it is adopted with unlawful discriminatory motive, can be challenged within the prescribed period after adoption. But allowing a facially neutral system to be challenged, and entitlements under it to be altered, many years after its adoption would disrupt those valid reliance interests that § 703(h) was meant to protect. In the context of the present case, a female tester could defeat the settled (and worked-for) expectations of her co-workers whenever she is demoted or not promoted under the new system, be that in 1983, 1993, 2003, or beyond. Indeed, a given plaintiff could in theory sue successively for not being promoted, for being demoted, for being laid off, and for not being awarded a sufficiently favorable pension, so long as these acts—even if nondiscriminatory in themselves—could be attributed to the 1979 change in seniority. Our past cases, to

---

[5] The dissent is mistaken to equate the application of a facially neutral but discriminatorily adopted system with the application of a system that is facially discriminatory. See *post,* at 916–917. With a facially neutral system the discriminatory act occurs *only* at the time of adoption, for each application is nondiscriminatory (seniority accrues for men and women on an identical basis). But a facially discriminatory system (*e. g.,* one that assigns men twice the seniority that women receive for the same amount of time served) by definition discriminates each time it is applied. This is a material difference for purposes of the analysis we employed in *Evans* and *Ricks*—which focuses on the timing of the *discriminatory* acts for purposes of the statute of limitations. It is also why the dissent's citation, *post,* at 915, of *Bazemore* v. *Friday,* 478 U. S. 385 (1986)—in which "[e]ach week's paycheck . . . deliver[ed] less to a black than to a similarly situated white," *id.,* at 395—is misplaced.

which we adhere today, have declined to follow an approach that has such disruptive implications.

\* \* \*

For the foregoing reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE STEVENS, concurring.

Although I remain convinced that the Court misconstrued Title VII in *American Tobacco Co.* v. *Patterson,* 456 U. S. 63 (1982), see *id.,* at 86–90 (dissenting opinion), and in *Delaware State College* v. *Ricks,* 449 U. S. 250 (1980), see *id.,* at 265–267 (dissenting opinion), the Court has correctly applied those decisions to the case at hand. And it is the Court's construction of the statute—rather than the views of an individual Justice—that becomes a part of the law. See *Johnson* v. *Transportation Agency, Santa Clara County,* 480 U. S. 616, 644 (1987) (STEVENS, J., concurring); *Dougherty County Bd. of Education* v. *White,* 439 U. S. 32, 47 (1978) (STEVENS, J., concurring). Accordingly, I join the Court's opinion.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

The majority holds today that, when it is alleged that an employer and a union have negotiated and adopted a new seniority system with the intention of discriminating against women in violation of Title VII, 42 U. S. C. § 2000e *et seq.,* the limitations period set forth in § 706(e), § 2000e–5(e), begins to run immediately upon the adoption of that system. *Ante,* at 909–911. This is so even if the employee who subsequently challenges that system could not reasonably have expected to be demoted or otherwise concretely harmed by the

new system at the time of its adoption, and, indeed, even if the employee was not working in the affected division of the company at the time of the system's adoption. This severe interpretation of § 706(e) will come as a surprise to Congress, whose goals in enacting Title VII surely never included conferring absolute immunity on discriminatorily adopted seniority systems that survive their first 300 days.[1] Because the harsh reality of today's decision, requiring employees to sue anticipatorily or forever hold their peace, is so glaringly at odds with the purposes of Title VII, and because it is compelled neither by the text of the statute nor our precedents interpreting it, I respectfully dissent.

The facts of this case illustrate the austere practical consequences of the majority's holding. On the day AT&T's seniority system was adopted, there was no reason to believe that a woman who exercised her plantwide seniority to become a tester would *ever* be demoted as a result of the new system. Indeed, under the new system, after five years a woman tester would regain her plantwide seniority; only in the intervening five years was she potentially endangered. Patricia Lorance, who was already a tester when the new system was adopted, almost made it; only after four years as a tester was she demoted under the terms of the new system. That the new system would concretely harm petitioners Janice King and Carol Bueschen was even more speculative. They became testers several months *after* the seniority system was modified, and like Lorance, they were not adversely affected by the restructured seniority system until 1982. (Indeed, absent the nationwide recession in the early 1980's, the petitioners might never have been affected.) Today, however, the majority concludes that these women are barred from bringing this suit because they failed to anticipate, within 300 days of the new system's adoption, that

---

[1] Or, in the case of a complaint not previously filed with a state or local agency, systems that survive their first 180 days. 42 U. S. C. § 2000e–(5)(e); *ante*, at 903, n. 2.

these contingencies would one day place them among the new system's casualties.

Nothing in the text of Title VII compels this result. On the contrary, even the majority concedes that a plausible reading of Title VII would regard the employer as having violated § 703(a)(1), 42 U. S. C. § 2000e–2(a)(1), the disparate-treatment wing of the statute, not only at the time of the system's adoption, but also when each concrete effect of that system is felt. *Ante*, at 906; see also 827 F. 2d 163, 166 (CA7 1987) (describing this interpretation as "logically appealing"). Under this continuing violation theory, each time a discriminatory seniority system is applied, like each time a discriminatory salary structure is applied, an independent "unlawful employment practice" under § 703(a)(1) takes place, triggering the limitations period anew. See *Bazemore* v. *Friday*, 478 U. S. 385, 395–396 (1986) ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII"); cf. *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 380 (1982) ("Where the challenged violation is a continuing one, the staleness concern disappears"). Viewing each application of a discriminatory system as a new violation serves the equal opportunity goals of Title VII by ensuring that victims of discrimination are not prevented from having their day in court.

Today's decision is the latest example of how this Court, flouting the intent of Congress, has gradually diminished the application of Title VII to seniority systems. First, the Court held that § 703(h), 42 U. S. C. § 2000e–2(h), requires special treatment for bona fide seniority systems under Title VII so that "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 82 (1977); see also *Pullman-Standard* v. *Swint*, 456

U. S. 273, 289 (1982).[2] Then, the Court held by a narrow margin that § 703(h) protects even those seniority systems put into place *after* the passage of Title VII. *American Tobacco Co* v. *Patterson*, 456 U. S. 63, 71 (1982).

The majority contends that the result it reaches today is dictated by these and other ill-advised precedents involving seniority systems, but in my view, today's decision compounds the Court's prior decisional errors by giving them unnecessarily broad scope. This extension is particularly inappropriate because it forces the Court to reach such a bizarre and impractical result. Never have we held or even intimated that, in the context of a statute of limitations inquiry, one must evaluate challenges to a seniority system born of discriminatory intent as of the moment of its adoption. Indeed, had we so held, the majority's concession that a worker may *at any time* challenge a facially discriminatory seniority plan under § 703(a)(1) would be flatly contradicted by precedent. *Ante*, at 912. The discriminatory intent that goes into the creation of even a facially flawed seniority plan is, after all, no different than the discriminatory intent that informs the creation of a facially neutral one. To impute ongoing intent in the former situation but not in the latter is un-

---

[2] It remains astonishing to me that seniority systems are sheltered from disparate-impact claims, see *Teamsters* v. *United States*, 431 U. S. 324, 377–394 (1977) (opinion of MARSHALL, J.). Even the majority concedes that "[a]s an original matter . . . a plausible, and perhaps even the most natural, reading of § 703(h)" regards that subsection as merely providing an affirmative defense to a disparate-impact action brought under § 703(a)(2). *Ante*, at 908.

But even accepting our precedents, I do not believe, as the majority does, that they prohibit the Court from finding that petitioners have made a timely and colorable claim of disparate impact under § 703(a)(2). 42 U. S. C. § 2000e–2(a)(2). In *Trans World Airlines* v. *Hardison*, 432 U. S. 63 (1977), we held only that bona fide seniority systems were exempted by § 703(h) from disparate-impact claims. Accepting as true petitioners' allegation that AT&T and its union restructured the seniority system for discriminatory reasons, this system should not qualify as a bona fide one entitled to immunity from disparate-impact claims.

tenable. The distinction the majority erects today serves only to reward those employers ingenious enough to cloak their acts of discrimination in a facially neutral guise, identical though the effects of this system may be to those of a facially discriminatory one.

Neither *United Air Lines Inc.* v. *Evans*, 431 U. S. 553 (1977), nor *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980), on which the majority premises its rejection of the continuing violation theory, compels today's result. In *Evans*, unlike the instant case, the plaintiff never alleged that the seniority system itself was set up in order to discriminate. Indeed, we observed that Evans "does not attack the bona fides of United's seniority system" and "makes no charge that the system is intentionally designed to discriminate." 431 U. S., at 560; see also *id.*, at 557. The sole discrimination alleged in *Evans* was in the plaintiff's prior discharge, the impact of which, she alleged, had been enhanced upon ¹.er return to work by the failure of the seniority system to accord her credit for time she would have served had she not been discharged. In denying her challenge to that system, we held that "a challenge to a neutral system may not be predicated on the mere fact that a past event [Evan's prior discharge] which has no present legal significance has affected the calculation of seniority credit." *Id.*, at 560. That holding is plainly inapposite here, where the very essence of petitioners' claim is that AT&T's discriminatorily adopted seniority system is *not* neutral. Thus, the majority's conclusion that the "past event" cited in this case—the discriminatory adoption of the very seniority system under legal challenge—has "'no present legal significance,'" *ibid.*, quoted *ante*, at 908, is *ipse dixit.*

*Ricks* is likewise inapposite. The allegedly discriminatory denial of tenure in that case served notice to the plaintiff that his termination a year later would come as a "delayed, *but inevitable* consequence," 449 U. S., at 257–258 (emphasis added). It was thus appropriate, as in so many areas involv-

ing statutes of limitations doctrine, to set the limitations clock running upon the plaintiff's discovery of harm to herself. Petitioners Lorance, King, and Bueschen, however, were given no such advance warning. For them, the majority holds, the limitations clock began running, and ran out, long before it was apparent that they would be demoted by AT&T's discriminatory system. Like *Evans, Ricks* stands for the proposition that neutral employment practices that passively perpetuate the consequences of prior, time-barred discrimination but are not themselves bred of discriminatory intent do not constitute actionable wrongs under Title VII. Neither case suggests that the operation of a seniority system set up *in order* to discriminate should be treated the same way as a legitimate seniority (or tenure) system, born of nondiscriminatory motives, which in a particular case may have the effect of passively reinforcing prior time-barred acts of discrimination.

Nor, finally, is it correct to say that *Machinists* v. *NLRB*, 362 U. S. 411 (1960), "establishes that the limitations period will run from the date the system was adopted," *ante*, at 909, and therefore controls this case. Initially, it bears mention that *Machinists* arose under a different statute, the National Labor Relations Act (NLRA), 29 U. S. C. §§ 151–169, and that *Machinists* did not involve a seniority system, but instead a union security clause which, it was alleged, had been defectively adopted. Significant though the role of the NLRA was as a model for Title VII's remedial provisions, these are hardly the indicia of a controlling precedent. Moreover, sound reasons support the finding of a time bar in *Machinists*, but no time bar here. In *Machinists*, as in *Ricks*, the enforcement of the challenged security clause was the inevitable consequence of its execution. The clause affected all nonunion employees alike, and from its very inception there was no mystery about which employees would be affected and about the impact it would have on them. By contrast, in this case, the very essence of petitioners' claim is

that AT&T's new seniority system was designed to have a long-range discriminatory impact, hurting women employees as a group but, as of the time of its inception, only theoretically hurting particular woman employees. Unlike *Machinists*, there is no indication that anyone employed at AT&T was, during the limitations period chosen by the majority, so tangibly affected by the new plan as to create any incentive to sue.[3]

The majority today continues the process of immunizing seniority systems from the requirements of Title VII. In addition to the other hurdles previously put in place by the Court, employees must now anticipate, and initiate suit to prevent, future adverse applications of a seniority system, no matter how speculative or unlikely these applications may be. This Court's observation that "limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes," *Ricks*, *supra*, at 262, n. 16, has an increasingly hollow ring. Because I do not believe that Congress, in framing Title VII, even remotely contemplated putting employees into the predicament which the majority today makes inevitable, I dissent.

---

[3] Tellingly, none of the Courts of Appeals presented with a claim of a continuing violation has reached the result the majority today reaches. Indeed, two of the Courts of Appeals have interpreted our precedents to *permit* claims of continuing violation. *Cook* v. *Pan American World Airways, Inc.*, 771 F. 2d 635, 646 (CA2 1985); cf. *Johnson* v. *General Electric*, 840 F. 2d 132, 135 (CA1 1988). Even the Seventh Circuit, finding petitioners' claim time barred in the judgment under review, adopted a far narrower interpretation than the majority, under which the limitations period begins to run on the date when the employee first becomes subject to the seniority system. 827 F. 2d 163, 167 (1987).