**Luther ARTIS, Plaintiff,**

v.

**UNITED STATES INDUSTRY and International Association of Machinists and Aerospace Workers and Hitachi–Zosen Clearing, Inc., Defendants.**

No. 85 C 10116.

United States District Court,
N.D. Illinois, E.D.

Aug. 25, 1989.

Miriam N. Geraghty, Kinoy, Taren, Geraghty & Porter, Chicago, Ill., for plaintiff.

William A. Widmer, III, Carmell Charone Widmer Mathews & Moss, and Marian C. Haney, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Luther Artis (Artis) brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, against his former employer Clearing Division of United States Industry (Clearing) and the International Association of Machinists and Aerospace Workers, plaintiffs' collective bargaining representative during the time he was employed by Clearing. Defendant Hitachi Zosen Clearing, Inc. subsequently purchased Clearing. We have before us defendants motion for judgment on the pleadings which invokes two recent decisions of the Supreme Court. Our review of those opinions compels us to deny defen-

dants' motion in part and to grant it in part.

## FACTS

Having visited the facts thrice before in our memoranda dated June 16, 1988, August 23, 1988, and May 4, 1989, we recite only those facts particularly relevant here. In approximately 1981 Clearing installed a Poreba engine lathe. According to Artis' deposition testimony, when the Poreba first arrived he inquired whether he could receive instructions on how to run the machine, but his request was denied (pl. dep. at 20–21). During 1982, thirteen operators from the engine lathe department, including plaintiff, were laid off. Artis was the most senior and the only black person among those machinists. He was laid off on November 9, 1982. Under the collective bargaining agreement then in effect he retained recall rights to the machinist's position for two years. He exercised his seniority rights and bumped to assembly helper, a position he held until January 23, 1983, when he was again laid off—maintaining recall rights to that position for two years. Subsequently, Clearing determined that it needed machinists to run the Poreba lathe to meet the demands of a specific contract. Lawrence Hale, the machine shop superintendent, first asked three white machinists—who had more seniority than plaintiff, had not been laid off, but did not have Poreba training—whether they would be willing to run the Poreba. These machinists refused. The decision was then made to recall two others, Messrs. Glowacki and McDonnell, who had less seniority than Artis but did have Poreba training. The company did not recall any laid-off machinist who was not Poreba-trained. Of that group, plaintiff was apparently the only black and had the most seniority. Pursuant to the seniority system, he therefore would have been the person recalled if a laid-off machinist were to be trained to operate the Poreba lathe. Artis was recalled as an assembly helper, effective February 22, 1983, but he declined, opting to wait until he was recalled to a machinist's position.

## DISCUSSION

Artis alleges two separate discrimination issues, each of which has been brought under both Title VII and § 1981. He first complains of discrimination in the decision as to who received Poreba training. And he separately alleges discrimination in the recall of two white machinists with inferior seniority. We consecutively evaluate each issue, with individual discussion respecting Title VII and § 1981.

### I. *Discrimination in Training*

#### A. *Title VII*

■ The Supreme Court's holding in *Lorance v. AT & T Technologies, Inc.,* — U.S. ——, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), does not compel dismissal of Artis' Title VII claim respecting alleged discriminatory training. *Lorance* evaluated the limitations period respecting the discrimination claims created by an intentionally discriminatory seniority system. The Court held that the limitations period begins to run not at the point where the impact becomes most obvious but, rather, at the time that the system is adopted.

Lorance implicitly requires satisfaction of three separate prongs before dismissal is considered appropriate. First, the original action about which the plaintiff complains must be outside the limitations period. Second, the defendant must demonstrate that the plaintiff knew or should have known, *at the time of the original action,* that he or she had suffered, or would suffer, "concrete" harm. And third, the defendant must demonstrate that the plaintiff knew or should have known, *at the time of the original action,* that it was discriminatory.

Neither side disputes that the alleged failure to train was outside the relevant limitations period. We conclude, however, that material issues of fact pertain to Artis' knowledge and therefore it cannot be conclusively determined that the limitations period began to run when Artis failed to receive Poreba training. Those issues of fact concern whether he knew or should have known of the requisite concrete harm and whether he knew or should have

known that his failure to receive training was motivated by race. *Lorance,* therefore, cannot compel dismissal at this time.

*Lorance* made clear that while more "painful" harm may well occur at a later date, the limitations period begins to run when the plaintiff suffers "concrete harm." 109 S.Ct. at 2266. By effect, the AT & T seniority system there at issue put women who had exercised their plant-wide seniority to become testers at risk of demotion. *Id.* The limitations period therefore began to run the day of its adoption because those women knew or reasonably should have known of the system's discriminatory impact. *See Lorance v. AT & T Technologies, Inc.,* 827 F.2d 163, 167 n. 3 (7th Cir. 1987) ("the affidavits that the plaintiffs submitted to the district court conclusively prove that the plaintiffs were aware that they had forfeited their plant-wide seniority on the day they became subject to the Tester Concept").

That knowledge element explains one of the central disputes between the majority and the dissent. Justice Marshall, in dissent, contends that "AT & T's new seniority system was designed to have a long-range discriminatory impact, hurting women employees as a group but, as of the time of its inception, only *theoretically* hurting particular women employees." *Lorance,* 109 S.Ct. at 2272 (Marshall, J., dissenting) (emphasis added). Contrast that description with Justice Scalia's conclusion that the women suffered "concrete harm" the day the "employer provide[d] a *patently* less desirable seniority guarantee than what the law requires." 109 S.Ct. at 2266 n. 3 (emphasis added). Further, the plaintiffs in *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *United Airlines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), also knew at the outset that they could expect to be harmed. *See Ricks,* 449 U.S. at 260, 101 S.Ct. at 505 (plaintiff teacher denied tenure); *Evans,* 431 U.S. at 554, 97 S.Ct. at 1887 (plaintiff woman forced to resign because of her marriage).

We conclude that material facts remain as to whether Artis knew or should have

known that his lack of Poreba training constituted "concrete harm." As such, the limitations period cannot run from the day he allegedly was discriminatorily denied training. *Lorance* certainly imposes a burden on potential plaintiffs to anticipate the consequences of present actions, but defendants would have us go further and limit the inquiry solely as to whether "concrete harm" was suffered. We think that misreads *Lorance*.

Whether Artis knew or should have known that his lack of Poreba training constituted "concrete harm," is ripe for resolution by the trier of fact:

> It is also unclear whether plaintiff was aware that he had been harmed by defendant's alleged failure to train him since such an action may well have been perceived by plaintiff as maintenance of the status quo rather than loss of employment rights.

*Artis v. United States Industry, et al.*, No. 85 C 10116, slip op, 1988 WL 89749 (August 23, 1988). Further, even if Artis knew he suffered "concrete harm," material facts remain as to whether he knew or should have known that the denial of training was racially motivated.

We await further guidance on the broader question of *Lorance*'s application beyond seniority disputes. In one sense, the Court decided the rather general "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale [claims]'". 109 S.Ct. at 2269, *quoting Ricks*, 449 U.S. at 260, 101 S.Ct. at 505. In another, the court evaluated the distinctly more specific "considerations underlying the 'special treatment' accorded to seniority systems" under Title VII. 109 S.Ct. at 2269, *invoking Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977). That "special treatment" "strikes a balance between the interests of those protected against discrimination by Title VII and those who work—perhaps many years—in reliance upon the validity of a facially lawful seniority system." *Lorance*, 109 S.Ct. at 2269.

We need not resolve these broader questions because the foregoing analysis makes clear that *Lorance* does not govern Artis' particular allegations. Invocation of *Lorance* in other circumstances will no doubt require evaluation of the broader questions of applicability. We leave that inquiry for another day and/or another court.

■ Separately, plaintiff submits that his training allegations purportedly constitute a disparate *treatment*, not a disparate *impact* claim. In such circumstances, *Lorance* could be interpreted to provide a different limitations period, one that employs a "continuing violation" theory. Respecting disparate *impact* claims, the clock begins to run at the time of "concrete harm." 109 S.Ct. at 2266 n. 3. But respecting disparate *treatment* claims, *Lorance* assesses the limitations period considerably differently:

> With a facially neutral system the discriminatory act occurs *only* at the time of adoption, for each application is nondiscriminatory (seniority accrues for men and women on an identical basis). But a facially discriminatory system (*e.g.*, one that assigns men twice the seniority that women receive for the same amount of time served) by definition discriminates each time it is applied.

109 S.Ct. at 2269 n. 5 (emphasis in original). Continuing the example, the limitations period begins anew each time that a woman experiences the effects of a facially discriminatory system. Similarly, Artis alleges that each time he encounters the effects of Clearing's disparate treatment in training, he receives the entire limitations period in which to allege a Title VII claim.

We cannot agree with this interpretation of *Lorance* because we think it too superficially invokes that opinion's footnote 5 and ignores the more general lesson therein. *Lorance* evaluated a facially nondiscriminatory seniority system which was assumed to have been implemented with an intent to discriminate. For a time the *Lorance* plaintiffs had a legitimate Title VII claim, but by the time the case was filed the statute of limitations had long since run. *Lorance* held those plaintiffs could

not revive the prior claim with the mere invocation of present effects. Similarly, Artis also had a legitimate Title VII claim for a while, and the later recall cannot rectify his earlier failure to sue.

In sum, we hold that material facts remain concerning his Title VII failure-to-train allegations. Since knowledge requirements are relatively unsettled, we assume that further elaboration will inevitably be forthcoming. We find that dismissal at the present time would be inappropriate but recognize that *Lorance* brings certain factual questions to the fore on which summary judgment eventually may be appropriate.

## B. *Section 1981*

■ We now evaluate the impact of *Patterson v. McLean Credit Union,* — U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) on Artis' § 1981 claim. *Patterson* held that a black former employee could not bring a claim for racial harassment resulting first in a failure to promote and, subsequently, in her discharge. The Court emphasized the literal language of § 1981:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (emphasis added). Focusing on the phrase, "to make and enforce contracts," the Court held that "Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations." 109 S.Ct. at 2372.

Rather, the relevant provision protects two rights: "the same right ... to make ... contracts" and "the same right ... to ... enforce contracts." The former protection extends "only to the formation of a contract, but not to problems that may apply later from the conditions of continu- ing employment." 109 S.Ct. at 2372. The latter "embraces protection of a legal process, and of a right to access to legal process, that will address and resolve contract-law claims without regard to race." *Id.* at 2373. At its core, *Patterson* held that racial harassment was post-contract behavior and therefore was not violative of § 1981.

Defendants contend that *Patterson* compels dismissal because Artis purportedly alleges only post-contract discrimination— an alleged refusal to offer him training on the Poreba.

The Court's decision certainly made clear that the alleged failure to train at issue here cannot constitute a violation of § 1981. *Patterson* holds out the possibility that certain post-contract behavior by the employer may well amount to a refusal to contract.

With the possible exception perhaps of her claim that respondent refused to promote her to a position as an accountant, see Part IV, *infra,* none of the conduct which petitioner alleges as part of the racial harassment against her involves either a refusal to make a contract with her or the impairment of her ability to enforce her established contract rights. 109 S.Ct. at 2374. We generously quote that part of Justice Kennedy's opinion, where he spells out the relevant considerations:

> Consistent with what we have said in Part III, *supra,* the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right ... to make contract ...," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer

is such a claim actionable under § 1981. *Cf. Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (refusal of law firm to accept associate into partnership (Title VII).

109 S.Ct. at 2377.

Easy application of those standards here renders Artis' failure-to-train claim insufficient. After training, Artis would have remained a machinist on the shop floor. That move seems more akin to the move from second- to third-year associate than to becoming a partner after seven or eight years of employment. More similar would be an alleged discriminatory denial of the opportunity to move into a management-type position. That change would entail "an opportunity for a new and distinct relation between the employee and the employer." *Id.* Here, however, the relationship between Clearing and Artis would have remained virtually identical—his paycheck may have been slightly larger and he would have instead worked on a European-designed machine. The discriminatory training claim arising from § 1981 is therefore dismissed.

## II. *Discrimination in the Recall*

### A. *Title VII*

 As the recall at issue occurred well within the relevant limitations period, this claim remains intact, unaffected by *Lorance.*

### B. *Section 1981*

 Though considerably more affected by *Patterson,* Artis' § 1981 claim also survives.

Brenda Patterson alleged, *inter alia,* that respondent "had harassed her, failed to promote her to an intermediate accounting clerk position, and then discharged her, all because of her race." 109 S.Ct. at 2369. And her § 1981 claim was circumscribed in deference to the statute's language and Title VII's "detailed and well crafted procedures for conciliation and resolution." *See* 109 S.Ct. at 2372–75. Artis' status differs in one important way: he was not actively working at the time of the allegedly discriminatory recall. As such, Artis seeks relief for racial discrimination in the formation of a contract in the sense that he was denied the opportunity to enter into a significantly different relationship, and he appropriately invokes the protections of § 1981.

### CONCLUSION

For the foregoing reasons, defendants' motion is denied.