Thomas E. HUELS, Plaintiff–Appellant,

v.

EXXON COAL USA, INC. and Exxon Corporation, Defendants– Appellees.

No. 96–3442.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1997.

Decided July 28, 1997.

Lee W. Barron, Gail Renshaw (argued), Wood River, IL, for plaintiff–appellant.

Edward S. Bott, Jr. (argued), Harry W. Wellford, Jr., Thompson Coburn, Belleville, IL, Ellen Cruickshank Wilcoxen, St. Louis, MO, Douglas B. Neagli, Exxon Company USA, Houston, TX, for defendants–appellees.

Before FLAUM, EASTERBROOK, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Thomas Huels claims his employer, Exxon Coal, and its parent, Exxon Corporation (we'll refer to both as Exxon), discriminated against him on the basis of his alcoholism in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* The district court granted summary judgment for Exxon, concluding part of Huels' suit predated the ADA and the remainder was barred by Huels' failure to file a timely complaint with the Equal Employment Opportunity Commission. This appeal followed.

At all times relevant to this appeal, Exxon's unincorporated Monterey division operated two mines, creatively dubbed "No. 1" and "No. 2," in southern Illinois. In 1978 Exxon hired Huels to work at No. 2, and in 1985 he was promoted to the level of production foreman. Exxon evaluated and ranked its workers, including Huels, annually. First, in late spring, each employee's supervisor prepared a written assessment of the employee's performance during the preceding year. After the assessment was reviewed with the employee, the supervisors met and used the assessments to rank the employees in relation to one another. Finally, the initial rankings list was passed on to the mine superintendent, who had the last word on the list's contents.

Huels scored quite well in many of the evaluations following his promotion. For example, in 1989 he ranked 28th out of 106 "first-line supervisors." He did even better in 1990 and 1991, ranking 21st out of 129 and 12th out of 112, respectively. In late 1991, however, Huels' performance slipped. Although Exxon says his work was so shoddy that it gave him a "final warning" to shape up or find a pink slip in his locker, we view the facts in the light most favorable to Huels, who admits only that he was having trouble keeping a positive attitude and that his supervisors were not pleased when he occasionally arrived late for work or called in "sick" just a few minutes before his shift was slated to start.

In January 1992 Huels told Exxon he had an alcohol problem and planned to seek treatment. After completing an inpatient program, Huels reported back to work in February 1992. However, because the position of production foreman fell within the reach of a corporate policy (adopted in the wake of the Exxon–Valdez oil spill) which prohibited employees with a history of substance abuse problems from holding certain safety-sensitive jobs, Huels was transferred to a position as a support foreman. Although Huels was aware of the transfer policy before seeking treatment and knew that as a support foreman he would still be considered a first-line supervisor and receive the same salary (roughly $54,000 a year plus benefits), he wasn't happy with the move. He immediately asked to be reassigned, complaining his new position forced him to perform "trivial and demeaning" tasks and left him with diminished responsibility.

A few months later, in June 1992, a new set of evaluations was released. This time Huels took a nose dive. In fact, he could hardly have fared worse. He was ranked dead last—51st out of 51—among first-line supervisors at No. 2 and second from the bottom—72nd out of 73—among foremen at both mines. Despite the low scores, which Huels attributes to his decision to seek alcohol treatment and not to his superiors' dissatisfaction with his job performance in 1991, Huels received a substantial raise.

Although Huels was not keen on his new job, he continued to work as a support foreman until March 1993, when a contractual dispute with No. 2's sole customer forced Exxon to shut down the mine and lay off most of its employees. In all, 350 employees, including 35 first-line supervisors, were sent home. The only supervisors kept on were those ranked near the top of the evaluation list. Because Huels was much closer to the other end of that list, he was laid off. To soften the blow, he was awarded a little over $31,000 in severance pay.

In July 1993, after coming out on top in the contract case, *see PSI Energy, Inc. v. Exxon Coal USA, Inc.,* 991 F.2d 1265 (7th Cir.1993), Exxon resumed operations at No. 2. However, citing a need to reorganize its work force due to competitive market forces and lingering uncertainty about the price at which its customer would purchase No. 2's coal, Exxon did not recall all of its workers. Unsurprisingly, those ranking near the tail end of the 1992 evaluations list, including Huels, were not asked back. In fact, the last production foreman to be recalled was ranked 67th out of 73 foremen, five spots above Huels. The last support foreman invited back was slotted 62nd. Despite his low ranking, Huels remained hopeful that he would eventually return to Exxon and asked to be recalled as late as October 1993.

In April 1994 Huels filed a complaint with the EEOC, claiming Exxon had violated the ADA by discriminating against him on the basis of his disability, alcoholism. The complaint focused on four discriminatory "acts": his 1992 transfer, his continued employment as a support foreman, his March 1993 layoff, and Exxon's failure to bring him back on board in October 1993. After receiving the green light from the EEOC, Huels filed this suit in district court. In response, Exxon moved for summary judgment, arguing Huels' cause of action accrued prior to the ADA's July 1992 effective date and that his EEOC complaint was filed too late. Huels countered that his suit survived the effective date of the ADA and was timely because it involved a "continuing violation" which ran from his transfer until Exxon failed to recall him in October 1993.

The district court sided with Exxon, reasoning any claim based upon Huels' transfer to support foreman predated the ADA and that, to the extent a "continuing violation" was at issue, Huels' EEOC complaint was untimely because it was filed more than 300 days after the first negative consequence of Exxon's alleged discrimination—the March 1993 layoffs. We review the district court's decision *de novo. Harmon v. OKI Sys.,* 115 F.3d 477 (7th Cir.1997).

Although the ADA was enacted in 1990, it did not become effective until July 26, 1992.

*See* 42 U.S.C. § 12111 note—Effective Date. Because the Act was not retroactive, Huels can only escape summary judgment if he can show that he was a victim of disability discrimination on or after the ADA's effective date. *See Graehling v. Village of Lombard,* 58 F.3d 295, 296–97 (7th Cir.1995); *Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 443 (1st Cir.1997). In addition, Huels was required to file his EEOC complaint within 300 days of Exxon's alleged discriminatory conduct. *See* 42 U.S.C. § 12117(a) (incorporating Title VII's charge filing requirements). As a result, because Huels filed his charge on April 12, 1994, he needs to show that Exxon discriminated against him after mid-June 1993.

Huels hit upon what he believed to be a winning theory. He alleged that his transfer, layoff, and Exxon's failure to recall him amounted to a continuing violation of the ADA. As Huels discovered in the district court, however, his theory was far from airtight. For if the March 1993 layoffs were in fact discriminatory, Huels' claim would have accrued at that point even if he later experienced additional painful consequences of that layoff. *See e.g., Graehling,* 58 F.3d at 297 ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination.") (quoting *Lever v. Northwestern Univ.,* 979 F.2d 552, 556 (7th Cir.1992)). Hoping to sidestep that snag, Huels now concedes the layoffs were not discriminatory and instead argues that Exxon's failure to recall him in October 1993 was a fresh act of discrimination which not only rendered his EEOC charge timely but also pulled his entire claim within the reach of the ADA.

We have little trouble concluding that Exxon's failure to recall Huels was not a fresh act of disability discrimination. Exxon claimed that competitive market forces and uncertainty about the price its purchaser would be obligated to pay under its contract for No. 2's coal forced it to reorganize and recall fewer workers than it had laid off. Huels has failed to point to any evidence suggesting those reasons were simply pretext for getting rid of alcoholic employees. *See Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995) (pretext "means a lie, spe-

cifically a phony reason for some action"); *see also PSI Energy, Inc. v. Exxon Coal USA, Inc.,* 17 F.3d 969 (7th Cir.1994) (later setting the contract price for No. 2's coal at $30 per ton). In addition, Huels has not shown that any nondisabled foremen were treated more favorably during the recall process. For example, although Huels alleged in his EEOC complaint and argued in his appellate brief that a foreman with a lower ranking was recalled (that would certainly be tough to prove given Huels' ranking, which, as we noted, was 51st out of 51 on one list and 72nd out of 73 on another), the record clearly shows that the last support foreman asked to return was ranked five spots ahead of Huels. Finally, although Huels argues he would have been recalled had he remained in his old job, the last production foreman brought back to No. 2 ranked eleven places above him.

■ However, even if Huels could show that he would have been recalled had he not been transferred, any claim based upon his allegedly discriminatory position on the list would have accrued when he was assigned that ranking. In *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), for example, an employer based its promotion and demotion decisions upon its employees' relative seniority. Prior to 1979, employees promoted to positions as "testers" accrued seniority based upon the amount of plantwide service they had under their belts. In 1979, however, a collective bargaining agreement changed the rules. Under the new agreement, testers were ranked by the number of years they actually worked as testers. In 1982 three female testers received demotions they would have been able to avoid had they been given credit for plantwide seniority. After filing a charge with the EEOC in 1983, they sued both their employer and their union, alleging the new seniority system was designed to

protect veteran male testers from newly promoted female testers with greater plantwide seniority. Reasoning the proper focus was upon the timing of the alleged discriminatory acts and not the time at which the consequences of those acts become most painful, *id.* at 907, 109 S.Ct. at 2266 (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (discrimination claim based upon denial of tenure accrued when professor learned of denial, not when he was terminated)), and that the plaintiffs' claim was "wholly dependent on discriminatory conduct occurring well outside the period of limitations," the Supreme Court held the plaintiffs' claim accrued in 1979—when they were assigned low rungs on the seniority ladder and not when those low rankings came back to haunt them 3 years later. *Id.* at 908, 109 S.Ct. at 2267 (citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 560, 97 S.Ct. 1885, 1890, 52 L.Ed.2d 571 (1977) (challenge to neutral seniority system may not be based upon "past event which has no present legal significance ... even if the past event might at one time have justified a valid claim against the employer")). As a result, the Court found that the testers' EEOC complaint was barred by the applicable limitations period.[1]

We reached a similar result in *Kennedy v. Chemical Waste Management, Inc.,* 79 F.3d 49 (7th Cir.1996). In that case Kennedy, a truck driver and member of the teamsters, was diagnosed with multiple sclerosis and transferred to a position as a janitor in 1988. Because his new job was not a union position, Kennedy lost over 20 years of seniority. In 1992 his employer returned Kennedy to his job as a truck driver but his old seniority did not join him for the ride. Two years later, when the employer reduced its work force, Kennedy was laid off. Had he been able to retain his seniority, he would not have lost

---

1. Although *Lorance*'s specific holding has been abrogated by statute—42 U.S.C. § 2000e–5(e)(2) now gives employees injured by the application of a seniority system which has been "adopted for an intentionally discriminatory purpose in violation of" Title VII the option of measuring the limitations period from the date of that application—its reasoning remains persuasive outside of the Title VII/intentionally discriminatory se-

niority system context. *See Knight v. City of Columbus,* 19 F.3d 579, 585 n. 4 (11th Cir.1994) (describing Lorance as " 'merely an application of the traditional distinction' between a continuing violation and the present consequences of a one-time past act of discrimination") (quoting *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 659 n. 18 (11th Cir.1993)).

his job. Kennedy filed an EEOC complaint and then sued, alleging his layoff violated the ADA. The district court dismissed the suit, concluding Kennedy's EEOC charge was untimely. We affirmed, finding although "the loss of seniority was a probabilistic rather than certain prelude to the loss against which seniority was a barrier," the only discrimination occurred and Kennedy's claim accrued no later than 1992. *Id.* at 50. We also stated that Kennedy should not feel that he lost his case due to a technicality, making clear that his 1988 transfer predated the ADA. *See id.* at 52. Finally, we noted that if, as Kennedy argued, his claim only accrued when his employer refused to retain him despite his lack of seniority, the statute of limitations in ADA cases would be rendered meaningless. After all, "[a]n employee discharged in 1992 could sue in 2002 after unsuccessfully demanding reinstatement, on the ground that he had been denied an accommodation." *Id.* at 51.

Although *Lorance* and *Kennedy* were statute of limitations cases and did not deal directly with the effect of a newly operative law, their reasoning applies with equal force here. *See Graehling,* 58 F.3d at 297. In each case, an employer committed a single dispositive (and allegedly discriminatory) act—it assigned certain employees poor positions on relative seniority lists. And although those employees only felt the most painful consequences of the employer's conduct down the road (when the lists were used in a nondiscriminatory manner to fire or demote employees), their claims accrued when the discriminatory act was committed. *Lorance,* 490 U.S. at 906–07; *Kennedy,* 79 F.3d at 50. We see no compelling reason to treat the neutral application of an allegedly discriminatory employee-ranking list compiled using performance evaluations differently from a list based upon relative seniority. As a result, even though Huels' low ranking was not a "certain prelude" to being laid off and then not being recalled, his claim—to the extent he ever had one—accrued when he, like the plaintiffs in *Lorance* and *Kennedy,* was assigned an allegedly discriminatory position on the ranking list. It follows, then, because Exxon made the critical decision to rank Huels at the bottom of

the barrel in June 1992, his position on the list simply cannot be the focus of an ADA claim.

AFFIRMED.