**Bernard C. DUSE, Jr.**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, et al.**

**Civ. No. B–84–455 (EBB).**

United States District Court,
D. Connecticut.

Feb. 5, 1990.

David S. Golub, Silver, Golub & Sandak, Stamford, Conn., for plaintiff.

Francis J. McNamara, Jr., Cummings & Lockwood, Kurt W. Hansson, John S. McGeeney, Paul Hastings Janofsky & Walker, Stamford, Conn., for defendant.

Kenneth J. Damato, Bridgeport, Conn., for intervenor.

## RULING ON PENDING MOTIONS

ELLEN B. BURNS, Chief Judge.

*Introduction*

This is a case in which the plaintiff, Bernard C. Duse, Jr., alleges that the defendants, the International Business Machines Corporation, ("IBM"), and several individually named IBM officials including former Chief Executive Officer John Opel, discriminated against him on the basis of his race, and that upon complaining of such treatment, he was retaliated against, demoted and subsequently discharged by his superiors, all in violation of 42 U.S.C. § 1981. The defendants contend that, in light of the Supreme Court's recent deci-

sion in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the plaintiff's allegations are no longer actionable under § 1981 and should be dismissed. Defendant Opel further contends that even if dismissal is not warranted as to all of the defendants, he is still entitled to summary judgment in this case.

For the reasons set forth below, the defendants' motion to dismiss is granted in part and denied in part. Defendant John Opel's motion for summary judgment is denied.

*Procedural Background*

The plaintiff brought suit against the International Business Machines Corporation ("IBM") and a number of individually named defendants for injuries he allegedly suffered as a result of racial discrimination and retaliation he experienced while employed at IBM. The suit, B–84–455, was filed on July 12, 1984, naming the IBM Corporation, James Beall and Donald Gavis as defendants. On July 8, 1985, the court granted the plaintiff leave to amend his complaint and to add IBM officials Myron Saranga, George Rnjak, Jack Ingersoll, and former Chief Executive Officer John Opel as party defendants.

The original complaint contained three counts. In counts One and Two, brought pursuant to 42 U.S.C. § 1981, the plaintiff claims that he was denied equal employment opportunity at IBM as a result of racial discrimination, and that the defendants intentionally retaliated against him for bringing complaints of racial discrimination.[1] Count Three, brought pursuant to the court's pendent jurisdiction over state law claims, alleges that the defendants breached their contractual obligation to provide the plaintiff with a full and fair opportunity for advancement within the company. Two additional state law claims alleging violations of the plaintiff's right to privacy and for the intentional infliction of emotional distress were added in an amended complaint filed on February 18, 1986.

While this lawsuit was pending before this court, the plaintiff filed a second lawsuit, B–86–242, in which Edward Seeberger and IBM were named as party defendants. The second suit, which was filed on May 19, 1986 and assigned to the docket of the Honorable Warren Eginton, alleged identical § 1981 and state law violations. By order of the court dated October 27, 1986, the two suits were consolidated onto the docket of this court.

On January 22, 1988, defendant Opel filed a motion for Summary Judgment. The remaining individual defendants filed a separate motion for Summary Judgment on certain of the state law claims, or alternatively for the dismissal of those claims. By order of the court dated November 17, 1988, the court dismissed the pendent state claims as to all defendants without prejudice. Oral argument was heard on December 21, 1988 on defendant Opel's Summary Judgment motion. While the motion was pending, the Supreme Court issued its decision in *Patterson*. Noting the potential impact of the *Patterson* decision upon the adjudication of the plaintiff's § 1981 claims, the court ordered the parties to supplement their pleadings by addressing the applicability of *Patterson* to the facts of this case.

On September 19, 1989, the court received supplemental briefs from both parties. While the plaintiff's brief was limited in scope to the impact of *Patterson* on the Opel summary judgment motion, the defendants filed a motion to dismiss and accompanying memorandum of law, in which they contend that the types of conduct alleged to have occurred are no longer actionable under § 1981, and that *Patterson* compels dismissal of all remaining claims against them. Due to the asymmetrical nature of their responses, the parties requested, and the court granted, additional time in which to respond. These additional briefs having been completed, the defendants' motion to dismiss and defendant

---

1. The plaintiff now seeks leave of the court, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend his Amended Complaint in order to make clear the basis for his claims for relief under § 1981. The plaintiff's motion to amend his complaint is granted.

Opel's motion for summary judgment are now ripe for decision.

*Factual Background*

The court notes at the outset that "the function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980)). In determining the motion, the court shall consider only those facts that appear on the face of the complaint. *Id.* Such facts are presumed to be true, and all reasonable inferences that may be drawn from them shall be made in favor of the non-moving party. *Id.* The court shall deny the motion "unless it appears to a certainty that the plaintiff can prove no set of facts entitling him to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

In accordance with the foregoing standard, the court regards the following facts as true. The plaintiff, Bernard C. Duse, Jr., resides in New Canaan, Connecticut. After graduating from Harvard Business School in 1970, Duse, a black male, was recruited by and accepted employment with IBM, where he worked continuously until his discharge from the company in 1984. (Complaint, ¶ 12, 13). Initially hired as a sales trainee, by 1977 Duse had been promoted to the position of Program Manager in the Technology Transfer Program, a position accorded a level–60 designation on the IBM professional staff. (Complaint, ¶ 18). From 1977 until 1983, Duse was assigned to a number of increasingly responsible positions for which he consistently received excellent evaluations for the performance of his duties. (Complaint,

¶ 17). Despite having successfully completed IBM's Middle Manager School in January, 1980, a program designed to prepare an employee to become a manager of managers, however, Duse was never promoted to such an upper-level managerial position with IBM.

In 1980, Duse was assigned to work on the planning and development of the Videotex Software and Telecommunication Services, ("Videotex"), a multi-million dollar software and telecommunication services system for the display of text and graphics information for access by business-users untrained in data processing. (Complaint, ¶ 25). From 1980 through 1983, Duse initiated, staffed and led the planning and development of the project. (Complaint, ¶ 25). The Videotex project was later judged by IBM management executives to be a multi-billion dollar business opportunity. (Complaint, ¶ 26). Notwithstanding the high regard in which his work was held, his existing qualifications and his desire to be assigned to a "people management" position, Duse was not selected to be the lead manager on the Videotex program when the position was created. (Complaint, ¶ 27).

Having been overlooked for promotion, Duse continued to work on the Videotex program, which in August of 1983 came under the first-line management of defendant James Beall. (Complaint, ¶ 29). In January, 1984, Duse filed an "Open Door" complaint[2] with IBM regarding its failure to advance him within the managerial staff, making known to the defendants his belief that his failure to be promoted was racially motivated. (Complaint, ¶ 28). When Beall became aware of his complaint, Beall instituted a deliberate course of conduct to "harass and discredit" Duse and "retaliate against him for his complaint." (Com-

2. The Open Door Policy at IBM is an internal grievance procedure designed to provide all IBM employees with the right to seek upper management review of any problems arising in the context of their employment with the company. The essential features of the policy include that any aggrieved employee has the right to have his or her complaint investigated by senior management personnel who is removed from the employee's immediate management, and that, if the employee is dissatisfied with the results of the investigation, he or she has the right to have such results reviewed by mail by the Chief Executive Officer at IBM, or where appropriate, in person. IBM managers to whom appeals are made are instructed that they should be sensitive to assure that no action is taken which may appear to be retaliatory for an employee's having initiated such an investigation. IBM Manager's Manual, Index no. 8-01.

plaint, ¶ 30). Beall's conduct included making racially derogatory remarks directed at Duse, threatening that Duse would be visited by members of the Ku Klux Klan, (Complaint, ¶ 32), and that he would regret having filed his complaint with IBM management. (Complaint, ¶ 34). Moreover, Beall accused Duse of sexually harassing a female member of Duse's staff, an allegation which was later demonstrated to be false. (Complaint, ¶ 33).

Pursuant to IBM policy, Duse brought Beall's threats against him to the attention of defendant Gavis, who was Beall's first-line manager, and to defendants Seeberger and Opel, (Complaint, ¶ 37), none of whom took action against Beall or attempted to mediate between Duse and Beall. (Complaint, ¶ 38). Instead, Duse was required, as a condition of his continued employment at IBM, to obtain a psychiatric evaluation, and ordered to remain away from work pending the results of the examination. (Complaint, ¶ 39). Although the results of the examination indicated that Duse was emotionally stable, he was required to be examined by another psychiatrist of the defendant's choosing. (Complaint, ¶ 41). These results again confirmed that Duse was mentally stable and able to work. During this period, IBM also initiated a 24 hour per day surveillance of Duse, in which armed security personnel employed by IBM entered onto the plaintiff's property without his permission, followed the plaintiff, and undertook inquiries into his personal life and background, the results of which were all reported to the defendants. (Complaint, ¶ 58).

In July, 1984, Duse was reassigned to a non-managerial position within IBM for which he was given no job title or written job description. The demotion was an effort to coerce the plaintiff into leaving the IBM workforce. (Complaint, ¶ 44). Duse was placed under the supervision of defendant Saranga, (Complaint, ¶ 47), where his difficulties with higher level management continued. Further protests that his reassignment was improper were unavailing. Duse's employment with IBM was terminated in November, 1984. An open-door investigation into the circumstances surrounding Duse's dismissal was prepared by defendant George Rnjak. Rnjak's report, which was intended to conceal the defendants' discriminatory conduct, concluded that the termination of Duse's employment was appropriate, and that Duse's allegations that his assignment to his current position was demeaning in light of his qualifications and experience at IBM, and that this assignment was racially motivated and was in retaliation for his continued complaints of improper racial bias on the part of the defendants, were unfounded. (Complaint, ¶ 55, 56).

*Discussion*

The plaintiff's various allegations that he was discriminated against on the basis of his race while employed with IBM may appropriately be sub-divided as follows:

A) That he was subject to racial harassment in the workplace;

B) That he was wrongfully demoted and eventually discharged because of his race;

C) That he was denied the opportunity to make a new contract with IBM as a result of the defendants' racially motivated refusal to provide funding for a proposed new business venture to be headed by the plaintiff;

D) That he was denied the right to enforce his contract with IBM as a result of the defendants' racially motivated failure to process his Open Door complaints;

E) That he was denied the opportunity to become the lead manager of the Videotex project as a result of the defendants' racially discriminatory denial of his promotion; and

F) That he was discharged from his employment with IBM in retaliation for his attempts to enforce his legal rights under § 1981.

The court shall address each of these claims in light of the Supreme Court's recent decision in *Patterson v. McClean Credit Union, supra.*

## A. Racial Harassment in the Workplace

■ In *Patterson*, a black woman employed as a teller with the defendant credit union, brought suit against her employer under § 1981[3] claiming that her employer had harassed her, failed to offer her training for higher level jobs and denied her wage increases, all because of her race. In affirming the Fourth Circuit's dismissal of Ms. Patterson's racial harassment claim, the Supreme Court held that "§ 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations." *Patterson, supra,* 109 S.Ct. at 2372. Reprehensible as this type of conduct may be, it "is not actionable under § 1981, which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Id.* at 2374.

In the present action, the plaintiff claims that he too was subjected to a racially hostile work environment. Since *Patterson*, however, acts of racial harassment, *per se*, are no longer cognizable under § 1981.[4] As such, the defendants' efforts to embarrass and humiliate the plaintiff by requiring him to undergo duplicative psychiatric evaluations, threatening him, and making him the focus of their racial slurs and unfounded accusations of sexual harassment, are all instances of "post-formation conduct by [his] employer relating to the terms and conditions of [his] continu-

ing employment" with IBM. *Id.* at 2374. Although such unseemly and bigoted conduct has no place in the workplace, it is nevertheless no longer actionable under § 1981. Accordingly, the plaintiff's claims of racial harassment must be dismissed.

## B. Racially motivated Demotion and/or Discharge

■ The plaintiff also contends that his demotion to a non-managerial position and eventual discharge from IBM were racially motivated, and therefore infringed on rights protected under § 1981. While the *Patterson* court did not directly address the question of whether an alleged discriminatory demotion or discharge would be actionable under § 1981, the language of the opinion clearly suggests that the statute does not extend to conduct by an employer after the contract relationship has been established. *Id.* at 2374. As the majority of courts to have considered this question in light of *Patterson* have concluded, an employer's demotion and discharge of an employee, even where racially motivated, is outside the scope of § 1981. "Under *Patterson*, once an individual has secured employment, the statute's protection of the right to make a contract is at an end. With respect to conduct that occurs after that point—including discharge—the individual must look to the more expansive provisions of Title VII." *Hall v. Cook County,* 719 F.Supp. 721 (N.D.Ill.1989).[5]

---

**3.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**4.** *See Becton v. Burlington Northern Railroad Co.,* 878 F.2d 1436 (6th Cir.1989) (claim of racial harassment is no longer cognizable under § 1981); *Brooms v. Regal Tube Co.,* 881 F.2d 412 (7th Cir.1989) (claims of racial harassment not actionable under § 1981); *Guerra v. Tishman East Realty,* No. 89 Civ. 1225 (LBS), 1989 WL 71145 (S.D.N.Y.1989) (same); *Hannah v. Philadelphia Coca-Cola Bottling Co.,* No. 89–0699, 1989 WL 71565, 1989 U.S.Dist. LEXIS

7200 (E.D.Pa.1989) (federal remedy for racial harassment is limited to actions under Title VII); *Jordan v. U.S. West Direct Co.,* 716 F.Supp. 1366 (D.Colo.1989) (allegations of racial harassment in the workplace no longer state a claim under § 1981).

**5.** *See also Overby v. Chevron U.S.A., Inc.,* 884 F.2d 470 (9th Cir.1989) (discriminatory termination not actionable under § 1981); *Becton v. Burlington Northern Railroad Co.,* 878 F.2d 1436 (6th Cir.1989) (job demotion is post-formation conduct outside scope of § 1981); *Gonzalez v. Home Insurance Co.,* No. 85 Civ. 5856 (JMC), 1989 WL 106467, 1989 U.S.Dist. LEXIS 8733 (S.D.N.Y.1989) (termination of insurance agent's contract is not actionable under § 1981); *Jones v. Alltech Assoc., Inc.,* No. 85 C 10345, 1989 WL 105234, 1989 Dist. LEXIS 10422 (N.D.Ill.1989) (termination is not actionable under § 1981). *But see Paddilla v. United Air Lines,*

Accordingly, the plaintiff's claims of discriminatory demotion and discharge must also be dismissed.[6]

#### C. *IBM's Refusal to Fund Start–Up Company*

 The plaintiff further alleges that, in violation of his right to make contracts under § 1981, the defendants have interfered with IBM's acceptance of his proposal to establish a new and independent business, to be funded initially by IBM, that would provide computer software services to users of IBM products.

While the plaintiff is correct in asserting that an employer is liable under § 1981 for any discriminatory conduct that interferes with an employee's right to make contracts,[7] the court finds no reference to this alleged business proposal in the plaintiff's amended complaint. Having previously failed to allege that such a transaction took place, the plaintiff cannot now rely on, and the court will not consider, such conduct as the basis for the claim that the defendants interfered with rights protected under § 1981. Even were the court inclined to allow the plaintiff to amend his complaint to comport with these recent allegations, however, the plaintiff would not benefit from a more favorable result.

The defendants assert, and the plaintiff does not deny, that their consideration of the plaintiff's business proposal was undertaken as part of pre-litigation settlement negotiations between the parties. In the course of those discussions, the plaintiff proposed a settlement under which IBM would provide the plaintiff with $2.5 million in funding for the creation of the new business venture. That this proposal was not accepted by IBM cannot now be submitted to the court in support of a claim that the defendants refused to enter into a contract with the plaintiff, regardless of the reasons underlying the defendants' decision ultimately to reject the proposal.[8]

The plaintiff points to no case law in support of his claim that rejection of a settlement offer is actionable under § 1981, and the court is unwilling to establish such a precedent here. Clearly, documentation of the defendants' refusal to finance the plaintiff's business proposal would not be admissible as evidence under Rule 408 of the Federal Rules of Evidence. While the admissibility of this information is not, *per se*, in question here, the court finds Rule 408 instructive nonetheless.

Rule 408 provides that an offer of a settlement "is not admissible to prove lia-

---

716 F.Supp. 485 (D.Colo.1989) (termination is a part of the making of a contract, and is thus actionable under § 1981); *Birdwhistle v. Kansas Power and Light Co.*, 723 F.Supp. 570 (D.Kan. 1989) (discriminatory discharge directly relates to contract enforcement, and is thus still actionable under § 1981).

**6.** By its own terms, *Patterson* carves out an exception to the post-formation conduct standard where such conduct results in a failure to promote. *See infra* at Section E. While it is certainly true that the plaintiff's demotion and discharge created a "new and distinct" relationship with the defendant, *Patterson, supra*, 109 S.Ct. at 2377, it cannot be said that either of these changes in the plaintiff's employment status with IBM involved the denial of an opportunity for the plaintiff to enter into a new contract with the defendant. Accordingly, they do not fall within the protections afforded by § 1981 for racially discriminatory promotion practices.

**7.** In construing the right to make contracts under § 1981, the *Patterson* court found that it:
Extends only to the formation of a contract, but not to problems that may arise later from

the conditions of continuing employment. The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such post-formation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.
*Id.* at 2372–73.

**8.** The plaintiff contends that, unbeknownst to him, a copy of his proposal was forwarded to defendant Beall, who upon receiving it, engaged in a series of racially motivated actions intended to embarrass and humiliate the plaintiff, undermine his credibility and ensure that the deal would never be consummated.

bility for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible." The exclusion of compromise efforts "is based on the strong public policy favoring negotiated resolution of disputes. Since parties may be inhibited in making offers of compromise by the fear that these will be used against them if the compromise efforts fail, the law alleviates that fear and encourages the making of offers of compromise by making these privileged." Wright & Graham, *Federal Practice & Procedure:* Evidence: § 5302. This same policy also precludes the plaintiff relying on the defendants' settlement offer in the present posture of the case as well. While the rule's prohibition against the admissibility of settlement offers is not absolute when the evidence is offered for other purposes, such as proving bias or prejudice of a witness, FRE Rule 408; *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 510 (2nd Cir.1989), the plaintiff has not indicated any valid reasons why this information should be considered by the court.

Absent any factual basis in the pleadings for his assertion that the defendants interfered with his right to enter into a contract with IBM, the court declines to address this argument as a basis for liability under § 1981.

D. *Discriminatory Administration of the IBM Open Door Policy*

■ The plaintiff further claims that the defendants violated his right to enforce contracts by denying him access to the company's Open Door grievance procedures, which, according to the plaintiff, were designed to provide for the non-discriminatory enforcement of an employee's contractual rights with IBM.[9] According to the plaintiff, such abuse of the company's internal grievance procedure implicates rights protected under § 1981.

The plaintiff is correct in stating that the *Patterson* court, in construing the scope of the right to enforce contracts under § 1981, found that it "embraces protection of a legal process, and of a right of access to legal process that will address and resolve contract law claims without regard to race." *Id.* 109 S.Ct. at 2373. The plaintiff is also correct in noting that the statute not only covers *"private* efforts to impede access to the courts," *Id.,* (emphasis in original), but also private efforts that "obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Id.* Affirming its earlier decision in *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the *Patterson* court went on to emphasize that "certain private entities such as labor unions, which bear explicit responsibilities to process grievances, press claims and represent members in disputes over the terms of binding obligations that run from the employer to the employee, are subject to liability under § 1981 for racial discrimination in the enforcement of labor contracts." *Id.* The plaintiff contends that, like the conduct of the labor unions held liable in *Goodman,* the defendants' conduct in denying him access to IBM's Open Door procedures violated his right to enforce contracts guaranteed by § 1981. The court finds this argument unavailing.

In a typical arbitration procedure established by a collective bargaining agreement, such as the one involved in *Goodman,* an aggrieved union member has the opportunity to present evidence to an arbitrator in an adjudicatory-type hearing, *See generally National Post Office Mailhandlers Local 304 v. United States Postal Service,* 751 F.2d 834, 841 (8th Cir.1985) (although not governed by the federal rules of procedure and evidence, an arbitration proceeding must provide the parties with a "fundamentally fair hearing"). *See also Bell Aerospace Division of Textron v. Local 516,* 500 F.2d 921, 922 (2nd Cir.1974). In contrast, IBM's Open Door process does not provide for any similar adjudicatory-style hearings in which an employee's grievances are resolved. IBM's Open Door process provides for only a limited investigation into an alleged grievance, in which a senior level manager conducts informal, *ex*

9. *See supra,* n. 2.

*parte* interviews with persons who may have knowledge concerning an employee's complaint, obtains relevant information from other sources, and determines on the basis of such information whether the employee has been treated appropriately under the company's policies. There are no hearings. No evidence is offered, and there is no opportunity for an employee to conduct direct or cross-examination of witnesses. Such a procedure can hardly be called a "method of adjudicating disputes" as described in *Patterson*. Moreover, whereas the grievance procedure available to the union members in *Goodman* was the exclusive means by which they could seek to enforce their contractual rights, *Goodman v. Lukens Steel Co.*, 580 F.Supp. 1114, 1157 (E.D.Pa.1984), *aff'd*, 777 F.2d 113 (3rd Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), no such exclusivity exists with respect to the Open Door process. The plaintiff in this case has at all times been free to assert his breach of contract claim against IBM without going through the Open Door process.

That the plaintiff has been unsuccessful in redressing his grievances within the internal mechanisms provided by the company does not lead this court to conclude that his right to enforce contracts under § 1981 has been violated. Rather, to claim that the defendants have failed to fairly provide him with access to the internal grievance procedures is to suggest only that the terms of the plaintiff's contract have not been honored. As the Court in *Patterson* concluded, however, § 1981 was not intended to provide protections for all breach of contract claims simply because racial animus has been alleged. *Id.* 109 S.Ct. at 2376. The fact that this lawsuit has been pending in federal court since 1984 is more than ample indication that the plaintiff has not been denied access to a forum competent to adjudicate his claims. The plaintiff cannot possibly assert, by reason of an alleged breach of his contract alone, that

he has been deprived of the right to enforce contracts. Accordingly, this claim must be dismissed.

### E. *Discriminatory Failure to Promote*

■ The plaintiff also contends that the defendants' decision not to promote him to lead manager of the Videotex project was racially discriminatory in nature. In support of this claim, the plaintiff points to the fact that in October, 1982, his job performance evaluation rating with IBM was unjustly lowered, in effect, eliminating him from consideration for the position. Notwithstanding his efforts in initiating, staffing and leading the planning and development of the early phases of the Videotex project, and his expressed desire to become lead manager of the mature project, he was passed over in favor of another applicant with less experience and a lesser job appraisal rating than the plaintiff. For the purposes of this motion, the defendants do not dispute these assertions. Rather, relying on the language of *Patterson*, they contend that their failure to promote the plaintiff is not cognizable under § 1981.

In *Patterson*, the Supreme Court found that an employer's refusal to promote an employee may be actionable under § 1981 where "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Id.* at 2377. The court indicated that a failure to promote would be actionable under § 1981 "only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." [10] *Id.*

The language in *Patterson* clearly states that not all denials of promotions are actionable under § 1981, even where racial discrimination has been alleged. In light of the Court's failure to define the meaning of a "new and distinct relation between employee and employer", however, the line

---

**10.** In adopting this language, the Court expressly rejected language of the appellate court that "claims of racially discriminatory ... promotion go to the very existence and nature of the employment contract and thus fall easily within § 1981's protection." 805 F.2d 1143, 1145 (4th Cir.1986). The court also appears to have rejected the suggestion of the dissenters that "it may well be ... that promotion claims will always be cognizable under § 1981." *Patterson, supra,* 109 S.Ct. at 2395. (dissenting opinion of Brennan, J.).

dividing promotions that continue to be actionable under § 1981 and those that do not is hardly one that is precisely drawn.[11] A hint as to the location of this boundary was provided by the Court's reference to *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), a Title VII case involving the refusal of a law firm to accept an associate into the partnership. The Court's reliance on *Hishon* suggests that in deciding whether there exists an opportunity to enter a new and distinct relationship in a particular case, a court should focus on whether the promotion involves a "change in status" of the employee, or a change in the terms of his or her contractual relationship with the employer. *Malhotra v. Cotter & Company,* 885 F.2d 1305 (7th Cir.1989). Such a change in both the employee's status and the terms of the contractual relationship is clearly present with respect to the promotion of an associate to partner. But as Judge Posner writing for the majority in *Malhotra* suggests, another interpretation of *Patterson* is possible, one which distinguishes between "routine" promotions (essentially an ordinary pay raise) available only to existing employees, which are no longer actionable under § 1981, and non-routine promotions, which would still be actionable for both employees already in the employer's workforce and to outside applicants for the job. *Malhotra, supra* 885 F.2d at 1311–12 This court finds the distinction between "routine" and "non-routine" promotions to be helpful in determining whether a "promotion rises to the level of an opportunity for a new and distinct relation between [an] employee and [an] employer."[12]

The defendants vigorously contest that their failure to promote the plaintiff to head the Videotex project deprived him of a new and distinct relationship with IBM. They claim that had Duse been promoted, he would have continued to perform essentially the same planning and development functions as he had previously performed, albeit with a substantially increased budget and workforce, and that such a routine promotion falls outside the scope of § 1981. As the plaintiff suggests in his memoran-

---

**11.** Numerous court have struggled over both the meaning of and the most appropriate means of determining whether a particular job opportunity constitutes a "new and distinct relation" with mixed results. *Matthews v. Northern Telecom, Inc.,* 1989 WL 131343, 1989 U.S.Dist. LEXIS 12926 (S.D.N.Y.1989) (whether a promotion from a field systems installer to a systems specialist rose to the level of a new and distinct relation between employee and employer a question of fact that was inappropriate for resolution on motion for summary judgment); *Mallory v. Booth Refrigeration,* 882 F.2d 908 (4th Cir.1989) (promotion from clerk to supervisor with a consequent increase in responsibility and pay satisfies [the *Patterson*] test); *Luna v. City and County of Denver,* 718 F.Supp. 854 (D.Colo. 1989) (summary judgment denied where official job description and qualifications for appointment for position of Project Inspector I and Engineer III indicate substantial differences between the two positions in supervisory responsibility, duties performed and required qualifications); *Sofferin v. American Airlines,* 717 F.Supp. 597 (N.D.Ill.1989) (dismissing § 1981 claim where successful completion by union member of probationary period and promotion to tenure status would result in no change in the employee's position); *Williams v. National Railroad Passenger Corp.,* 716 F.Supp. 49 (D.D.C. 1989), (summary judgment appropriate when employment relationship would not be altered in any way except for a change in pay); *Crader*

*v. Concordia College,* 724 F.Supp. 558 (N.D.Ill. 1989), (failure to promote plaintiff from Assistant Director to Director in Housekeeping Division did not fundamentally alter the quality of the employment relationship); *Artis v. United States Industry,* 720 F.Supp. 105 (N.D.Ill.1989) (failure to train plaintiff was not actionable where provision of such training would not have significantly changed the nature of the relationship with his employer); *Anderson v. United Parcel Service,* 1989 WL 122307, 1989 U.S.Dist. LEXIS 12195 (N.D.Ill.1989) (summary judgment appropriate where the plaintiff failed to satisfy his burden in demonstrating that promotion from supervisor to manager constitute a new and distinct relationship between employee and employer).

**12.** In his concurrence in *Malhotra,* Judge Cudahy also laments the fact that *Patterson* fails to provide a meaningful definition of the "new and distinct relation" standard, a term which "nowhere appears in the generally accepted contracts jurisprudence." *Malhotra, supra* 885 F.2d at 1317, n. 6. According to Judge Cudahy, "there is no obvious reason why the Court did not intend by 'new and distinct relation' to simply refer to 'a new job' as laypersons might understand the term. The 'new and distinct relation' test may simply involve a substantial change in the plaintiff's job duties and responsibilities. At least no cogent rationale has been cited for the test's meaning anything more." *Id.*

dum of law in opposition to the motion to dismiss, however, a formal promotion to manager of the Videotex project carried with it substantially greater duties and responsibilities, including the supervision of over two hundred employees. Moreover, the new job allegedly involved a higher job designation within IBM, an increase in salary, as well as significantly more involvement in the financial aspects of developing and budgeting for this multi-billion dollar project. One would expect that in selecting a new manager for a project of such financial promise to the company, strong consideration, if not preference, would have been afforded to an individual who had helped to develop and steward the project to its projected levels of growth and profitability. Yet, the plaintiff was not even considered for the job.

The financial projections of the Videotex project alone suggest that the process of filling the position of lead manager for the project was hardly one that would have been taken lightly by IBM management. They further suggest that had Duse been promoted to the position of lead manager of the Videotex project, a project which appears to have been emerging from its research and development phase and into a full-fledged division of the corporation, such promotion may well have involved substantially more responsibilities than the plaintiff's previous position with IBM. Combined with his allegations that his failure to advance within the managerial ranks at IBM was racially motivated, the court finds that the plaintiff has stated a claim of racially discriminatory promotion under § 1981 which denied him the opportunity to enter a new and distinct relation with his employer. Accordingly, the defendants' motion to dismiss this aspect of the complaint is denied.[13]

## F. Retaliatory Discharge

Finally, the plaintiff claims that the defendants are subject to § 1981 liability for retaliating against him for his having sought to exercise his right to enforce contracts, and specifically for discharging him from his employment with IBM for engaging in such conduct. The defendants respond that, after *Patterson*, a cause of action for retaliation is actionable only under Title VII.

The *Patterson* court did not specifically address the question of whether an employer's discharge of an employee in retaliation for asserting a claim of racial discrimination amounts to an interference with the employee's right to enforce contracts. Once again, the lower courts have split in determining whether such a claim survives *Patterson*. This court sides with the majority of courts that have concluded that a retaliatory discharge is not cognizable under the right to enforce contracts prong of § 1981 so long as an employer's actions do not interfere with the employee's access to the courts.[14] Having already determined that the defendants had not interfered with the plaintiff's right to enforce contracts, *See supra*, Section D, it must follow that

---

**13.** A number of factors potentially bearing on the question of whether the plaintiff's position within IBM would amount to a "new and distinct relation" with the company go unanswered in the complaint. For example, what were the specific new duties of the Videotex manager for which the plaintiff would now be responsible? How would Duse's promotion have affected his status within IBM? What were the ramifications of the promotion on Duse's future opportunities for advancement within the company? Was the candidate eventually selected to head the Videotex project an IBM employee, or was he brought in from outside the then existing IBM workforce? Was the Videotex project, in effect, being elevated from a research and development phase to a new and separate division within the company? What was the nature of IBM's commitment to the development of the project before and after the period in which the new manager was selected?

**14.** *Overby, supra* (upholding summary judgment against plaintiff alleging that he had been discharged in retaliation for filing a complaint with the EEOC); *Matthews, supra* (dismissing claim of retaliatory discharge where such discharge did not cause legal obstruction to the plaintiff's case); *Alexander v. New York Medical College*, 721 F.Supp. 587 (S.D.N.Y.1989) (retaliatory discharge does not amount to a refusal to make a contract or the impairment of plaintiff's ability to enforce established contract rights); *Williams, supra* (same). *But see Jordan, supra* (allegations of retaliatory discharge are within coverage afforded by the right to enforce contracts contained in § 1981).

the plaintiff's claims of retaliation for pursuing this claim must also fail. *Williams, supra,* 716 F.Supp. at 52. This is not to say, however, that an employee who is retaliated against for protesting conduct that is protected under § 1981, such as protesting a discriminatory denial of a promotion, cannot seek relief under the statute.

The court finds support for this conclusion in the pre-*Patterson* case of *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38 (2nd Cir.1984), in which the Second Circuit joined the Fifth, Sixth, and Eighth Circuits in holding that § 1981 proscribed retaliation for asserting rights protected by that provision. The *Choudhury* court stated that:

> An employee who is punished for seeking administrative or judicial relief, regardless of the merits of his initial claim, has failed to secure that right to equal treatment which constitutes the fundamental promise of § 1981. When a complainant experiences retaliation for the assertion of a claim to even-handed treatment, he remains under a handicap not faced by his colleagues. Such inequality, we believe, is proscribed by § 1981.

*Id.* at 43. While the substantive rights protected under § 1981 may have been narrowed by the Supreme Court's recent decision in *Patterson,* there is nothing in that decision that undermines the policy supporting relief for those who have been retaliated against for "protesting policies squarely prohibited by § 1981." *English*

*v. General Development Corp.,* 717 F.Supp. 628, 632–33 (N.D.Ill.1989).[15] Because the plaintiff may have such a claim based on the denial of his promotion to lead manager of the Videotex project, *Malhotra, supra,* 885 F.2d at 1313, the defendants' motion to dismiss the retaliation claim is denied.

### Defendant Opel's Motion for Summary Judgment

■ The court now turns to Defendant Opel's motion for summary judgment. The basic principles for granting a motion for summary judgment are well-settled. Rule 56 of the Federal Rules of Civil Procedure provides, in part, that summary judgment shall be rendered only when a review of the entire record demonstrates "that there is no genuine issue as to any material fact." A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is on the moving party to establish that no relevant facts are in dispute. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In determining whether a genuine issue has been raised, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2nd Cir.1987).

15. Although finding that the question was not squarely before it, the Seventh Circuit, in *Malhotra v. Cotter & Company, supra,* has suggested that a claim for retaliation, such as the one at issue here, survives *Patterson.* In his concurring opinion, Judge Cudahy expressed his belief that the majority's failure to decide the question of whether § 1981 may be applied to retaliation claims was "unnecessarily tentative," stating that:

> The ability to seek enforcement and protection of one's right to be free of discrimination is an integral part of the right itself. A person who believes he has been discriminated against because of his race should not be deterred from attempting to vindicate his rights because he fears his employer will punish him for doing so. Were we to protect retaliatory conduct, we would in effect be

discouraging the filing of meritorious civil rights suits and sanctioning further discrimination against those persons willing to risk their employer's vengeance by filing suits. Section 1981 would become meaningless if an employer could fire an employee for attempting to enforce his rights under that statute. The recognition of a right of action for retaliation under section 1981 is simply another application of a straightforward syllogism: if an employee is granted certain substantive rights against his or her employer, the employer may not punish the employee's assertion of those rights, since this would allow the employer to take away a right to protection conferred by statute.

*Id.* at 1314 (quoting *Goff v. Continental Oil Co.,* 678 F.2d 593, 598 (5th Cir.1982)).

In the present case, defendant John Opel, a former Chief Executive Officer and Chairman of the Board of IBM, contends that the only evidence of his personal involvement in the case is his signature on the plaintiff's employment termination letter with IBM, which he claims to have no present recollection of ever having sent. Opel contends that all of the other alleged acts of racial discrimination in this case, including the decision not to promote Duse to head the Videotex project, were made by his subordinates without his personal involvement or approval. According to the defendant, such evidence is entirely inadequate to support an inference that he was personally guilty of intentional discrimination against the plaintiff in violation of § 1981.

The plaintiff disputes these assertions, arguing that Opel was directly involved in approving IBM's denying him a promotion to the head of the Videotex project. Specifically, the plaintiff claims that in 1982–83, when IBM was in the process of selecting an individual to head the Videotex project, his immediate managers unjustly lowered his approval rating from a "2" to a "3". The plaintiff immediately filed an "Open Door" complaint with Opel, in which he expressed his contention that the lowering of his appraisal rating was unwarranted and done with the intention of preventing him from being promoted. By letter dated November 22, 1988, Opel denied the plaintiff's appeal, and allowed the lowered appraisal to stand. Shortly thereafter, a new head of the Videotex project was appointed, an individual with less formal education, less managerial experience, and a lower appraisal rating than the plaintiff. The plaintiff was not even interviewed for the position. He again filed a complaint with IBM for its failure properly to promote and advance him in its managerial staff, this time making known to the defendants his belief that such failure to promote him was based on racial discrimination, to little or no avail.

It is clear from this brief synopsis that the party's versions of the events which took place are in conflict. Such conflict indicates the existence of a genuine dispute regarding issues material to the case, specifically regarding the question: "What did defendant Opel know about the Duse affair, and when did he know it?" IBM's financial stake in the Videotex project, the obvious importance to the corporation of selecting a competent manager for this new, multi-billion dollar venture, the plaintiff's frequent use of the Open–Door process, and in particular complaints filed with the defendant just prior to and just after the Videotex position was filled, and the extraordinary nature of IBM's alleged subsequent conduct, including placing 24 hour surveillance on the plaintiff, strongly support an inference that this affair was one necessitating the attention and personal involvement of IBM's Chief Executive Officer. Whether Mr. Opel was actually personally involved in the case, and whether the nature of his involvement was such that he can be held accountable for the denial of the plaintiff's promotion, or for retaliating against the plaintiff for his having sought to enforce his rights under § 1981, are questions of fact best left to a jury to decide. Accordingly, defendant Opel's motion for summary judgment is denied.

*Conclusion*

For the reasons stated above, the defendants' motion to dismiss is granted in part and denied in part. Defendant John R. Opel's motion for summary judgment is denied. The plaintiff is directed to amend his complaint to comport with this ruling by February 26, 1990.

SO ORDERED.