107 F.3d 4
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
S & S TOBACCO & CANDY CO., INC., Plaintiff-Appellee-Cross-Appellant,
v.
STOP & SHOP COMPANIES, INC.; Stop & Shop Supermarket
Holdings Co., Inc.; Stop & Shop Supermarket Co.;
Stop & Shop Holdings, Inc.,
Defendants-Appellants-Cross-Appellees.
 Nos. 95-9263 (L), 95-9265(XAP).
 United States Court of Appeals, Second Circuit.
 Jan. 30, 1997.
 
 APPEARING FOR APPELLANTS-CROSS-APPELLEES: John Rose, Jr., Levy & Droney, Farmington, Conn.
 APPEARING FOR APPELLEE-CROSS-APPELLANT: Alexander P. Starr, Reed Smith Shaw & McClay, Washington, D.C.
 PRESENT: NEWMAN, Chief Judge. CARDAMONE and ALTIMARI, Circuit Judges.
 
 
 1
 This cause came on to be heard on the transcript of record from the United States District Court for the District of Connecticut and was argued by counsel.
 
 
 2
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the amended judgment of the District Court is hereby AFFIRMED.
 
 
 3
 S & S Tobacco & Candy Co. ("S & S Tobacco"), the plaintiff in the underlying suit, and several entities of Stop & Shop Companies, Inc. (collectively "Stop & Shop"), defendants in the underlying suit, appeal from the District Court's October 12, 1995, amended judgment entered following a bench trial. Five issues are raised: (i) S & S Tobacco's claim that it did not breach its contract with Stop & Shop by retaining the manufacturers' cash discount on price increases; (ii) Stop & Shop's claim that S & S Tobacco's breach was material and hence justified Stop & Shop's early termination of the contract; (iii) S & S Tobacco's claim that the Term Provision of the contract required more than a six-month notice of cancellation to terminate the contract; (iv) Stop & Shop's claim that the District Court erred in refusing to admit into evidence statements made by S & S Tobacco officials during settlement negotiations; and (v) Stop & Shop's claim that S & S Tobacco waived its contractual right to require Stop & Shop to order cigarettes from S & S Tobacco by means of a particular electronic ordering system.
 
 
 4
 1. The District Court properly found that S & S Tobacco breached its contract with Stop & Shop by retaining for itself the 3.25 percent cash discount offered by cigarette manufacturers on incremental price increases. The Price Provision of the contract clearly states that the price of cigarettes, as between the parties to the present suit, "will be the manufacturer's cost price per carton less normal cash discount--which at this time is three and one-quarter percent (3 1/4%), plus the respective state cigarette tax plus an upcharge of five cents." (emphasis added).
 
 
 5
 S & S Tobacco interprets this provision to mean that the "cash discount" of 3.25 percent applies only to the base price charged by manufacturers when the contract began, and that it is silent concerning whether the discount applicable to subsequent price increases above the base price must be passed through to Stop & Shop. S & S Tobacco points to the Price Protection Provision--"[a]ll price protection afforded to [S & S Tobacco] from the cigarette manufacturers will be passed on to [Stop & Shop] ... except for all efficiency of payment incentives"--to support its claim that it was not required to pass through the 3.25 percent cash discount on subsequent price increases above the base price because this discount represents an "efficiency of payment incentive[ ]" within the meaning of the Price Protection Provision.
 
 
 6
 S & S Tobacco's interpretation of the contract " 'torture[s] words to impart ambiguity where ordinary meaning leaves no room for ambiguity.' " Sturman v. Socha, 463 A.2d 527, 533 (Conn.1983) (citation omitted). First, the Price Provision plainly states that the "price" of the cigarettes, as between S & S Tobacco and Stop & Shop, would be the manufacturer's cost price "less normal cash discounts" plus tax and a five-cent upcharge. Second, this provision's description of the cash discount--"which at this time is three and one-quarter percent"--strongly suggests that the amount of the cash discount could change over time and would be applied to future price increases over the life of the contract. S & S Tobacco's attempt to confine the passed-through cash discount to the 1986 base price adds a qualification to the price term not plainly within it. Third, S & S Tobacco's attempt to rely on the Price Protection Provision fails because, if manufacturers' cash discounts constitute "efficiency of payment incentives," then this provision would directly contradict the Price Provision: while the latter provision requires S & S Tobacco to pass through the cash discount to Stop & Shop, the former provision (as construed by S & S Tobacco) permits S & S Tobacco to retain the cash discount as an efficiency of payment incentive. S & S Tobacco can escape from this inconsistency only by claiming that the cash discount applicable to the base price does not represent an efficiency of payment incentive, but that the same cash discount, when applied to subsequent price increases, somehow becomes an efficiency of payment incentive.
 
 
 7
 Because the plain meaning of the Price Provision is that the price for cigarettes is the manufacturer's cost less any cash discounts, and because the only plausible interpretation of the Price Protection Provision is that the 3.25 percent cash discount does not constitute an efficiency of payment incentive, we agree with the District Court that S & S Tobacco breached the contract by retaining the cash discount on price increases.
 
 
 8
 2. The District Court found that although S & S Tobacco breached the contract, the breach was immaterial. Because only an "uncured material failure of performance" by one party can discharge the other party from its duty to render executory performances under a contract, Bernstein v. Nemeyer, 570 A.2d 164, 168 (Conn.1990), the Court concluded that Stop & Shop's termination of the contract, upon learning of S & S Tobacco's retention of the cash discount, without timely notice to S & S Tobacco, constituted a breach of the contract. Stop & Shop contends that its termination was justified because S & S Tobacco's breach was material.
 
 
 9
 Connecticut law requires the factfinder to examine the five factors listed in the Restatement (Second) of Contracts § 241 (1981), to determine whether a breach was material. Bernstein, 570 A.2d at 168 n. 8. An "adverse conclusion" on any one of these factors "is not decisive but is to be weighed with other factors" in deciding the issue of materiality. Vincenzi v. Cerro, 442 A.2d 1352, 1354 (Conn.1982). Applying these factors to the present circumstances, we agree with the District Court that S & S Tobacco's retention of the cash discount on price increases did not amount to a material breach.
 
 
 10
 First, S & S Tobacco's retention deprived Stop & Shop of very little of the benefit it expected to receive under the contract. The only benefit Stop & Shop lost was the opportunity to pay approximately 0.3 percent less than it actually paid for the 6.7 million cartons of cigarettes it purchased from S & S Tobacco. See, e.g., id. at 1354 (4.5 percent deviation from contract price not material). Second, Stop & Shop's injury was easily compensable. In fact, it essentially compensated itself by withholding approximately 78 percent of S & S Tobacco's unwarranted retention in its final payment to S & S Tobacco. Third, S & S Tobacco suffered a severe forfeiture due to Stop & Shop's cancellation of the contract, which represented 40 percent of the former's gross revenues. Fourth, when confronted with the overcharge issue, S & S Tobacco offered to reduce its prices and to repay the disputed overcharge in the form of future credits. Finally, the District Court found that S & S Tobacco honestly, though mistakenly, believed that it was entitled to retain the cash discount on subsequent price increases under the contract.
 
 
 11
 3. S & S Tobacco contends that the District Court erred in calculating the amount of damages properly attributable to Stop & Shop's termination of the contract by finding that the contract required only a six-month notice of cancellation. The Term Provision describes the contract as an "[a]nnual contract renewable each year with a six month (6) notice of cancellation of either party."
 
 
 12
 S & S Tobacco argues that the plain meaning of this provision is that the contract would automatically renew for an additional year if neither party notified the other of its intent to cancel the contract on or before February 4th of each year--six months before August 4th, the contract's anniversary date. Theoretically, therefore, the contract could continue for as long as 17 months and 29 days after one of the parties gave notice of cancellation, if notice were given on February 5th. Under this interpretation, because Stop & Shop did not give its notice of cancellation until April 20, 1989, the contract automatically renewed for the period from August 4, 1989, to August 4, 1990.
 
 
 13
 We reject this interpretation in favor of the District Court's more natural reading of the Term Provision--that the contract is of indefinite duration, renews automatically on a yearly basis, and is terminable upon the giving of six months' notice at any time. As Stop & Shop points out, the parties could easily have drafted a provision that stated what S & S Tobacco now claims the actual Term Provision states, for instance, "This contract is an annual contract renewable each year unless cancelled by either party by written notice within six (6) months of the renewal date." Moreover, Stop & Shop's interpretation should prevail because "ambiguities in contract documents are resolved against the party responsible for its drafting." Cody v. Remington Electric Shavers, 427 A.2d 810, 812 (Conn.1980); see Sturman, 463 A.2d at 532. S & S Tobacco concedes that it drafted the Term Provision. The District Court properly concluded that six months was the time period to use to measure S & S Tobacco's damages arising from Stop & Shop's unjustified termination of the contract.
 
 
 14
 4. Stop & Shop contends that the District Court erred in refusing to admit into evidence statements made by S & S Tobacco officials during settlement negotiations between the parties on March 29, 1989. It argues that Fed.R.Evid. 408 did not preclude the admission of such evidence because: (i) S & S Tobacco conceded its liability for retaining the 3.25 percent cash discount and there was, therefore, no "disputed claim" discussed on March 29th, and (ii) statements made by S & S Tobacco should have been admitted to show its "state of mind"--i.e., to show that it knowingly and deliberately overcharged Stop & Shop.
 
 
 15
 The District Court has "broad discretion in deciding whether to admit evidence, and its determinations will not be reversed in the absence of an abuse of discretion amounting to error." Sage Realty Corp. v. Insurance Co. of North America, 34 F.3d 124, 128 (2d Cir.1994). That abuse of discretion standard applies both to the trial court's decision to exclude consideration of evidence for the purpose of showing liability under Rule 408, and also to its decision to exclude consideration of such evidence under the "another purpose" exception to this rule. See Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir.1989). The District court did not abuse its discretion in this case.
 
 
 16
 First, there was ample evidence to support S & S Tobacco's claim that it vigorously disputed the validity of Stop & Shop's claim of wrongful overcharge during the March 29th negotiations. Although S & S Tobacco acknowledged that it knowingly retained the 3.25 percent cash discount, it also claimed that it honestly believed that it was entitled to retain this amount. S & S Tobacco's offer during the negotiations to refund the retained amount to Stop & Shop is precisely the type of admission protected by Rule 408. See Duse v. IBM, 748 F.Supp. 956, 963 (D.Conn.1990).
 
 
 17
 Second, this Court has noted that " 'care should be taken [to ensure] that an indiscriminate and mechanistic application of this "exception" to Rule 408 does not result in undermining the rule's public policy objective' " of encouraging " 'future settlement negotiations.' " Trebor Sportswear, 865 F.2d at 510 (citation omitted). Where the "another purpose" sought to be established through evidence otherwise prohibited by Rule 408 is "the necessary first step to proving, ultimately, the validity of [a party's] claims of breach of contract," for instance, the admission of such evidence "even initially" for a purpose not directly related to liability would "militate against the public policy considerations which favor settlement negotiations and which underlie Rule 408." Id. Here, Stop & Shop attempted to introduce statements made by S & S Tobacco during the negotiations in order to establish the latter's liability under the Connecticut Unfair Trade Practices Act ("CUTPA"), which renders a party liable if, among other things, its conduct "offends public policy" and is "immoral, unethical, oppressive, or unscrupulous." McLaughlin Ford, Inc. v. Ford Motor Co., 473 A.2d 1185, 1191 (Conn.1984). Because the issues of S & S Tobacco's state of mind and its liability under CUTPA are "so closely intertwined," Trebor Sportswear, 865 F.2d at 510, the District Court properly refused to consider evidence from the settlement negotiations, even for the ostensibly "other" purpose of showing S & S Tobacco's state of mind. Cf. In re Wines, 997 F.2d 852, 856 (11th Cir.1993) (excluding evidence under Rule 408 even though it was probative of fraudulent intent).
 
 
 18
 5. Stop & Shop was required under the contract to transmit its cigarette orders to S & S Tobacco via an electronic ordering system called "Telzon." It is undisputed that Stop & Shop never ordered anything from S & S Tobacco through this medium. Stop & Shop contends that S & S Tobacco waived its contractual right by acquiescing in Stop & Shop's refusal to implement a Telzon system.
 
 
 19
 "Whether conduct constitutes a waiver is a question of fact." Cassella v. Kleffke, 660 A.2d 378, 382 (Conn.App.Ct.1995) (quotations and citation omitted). Although waiver "may be inferred from the circumstances if it is reasonable so to do," Fisette v. DiPietro, 611 A.2d 417, 421 (Conn.App.Ct.1992) (quotations and citation omitted), there cannot be a finding of waiver unless the party has both "knowledge of the existence of the right and intent to relinquish it." Heyman Associates No. 1 v. Insurance Co. of Pennsylvania, 653 A.2d 122, 133 (Conn.1995).
 
 
 20
 The District Court properly concluded that S & S Tobacco did not waive its right to have Stop & Shop transmit its orders via Telzon. The Court credited the testimony of S & S Tobacco employees that they called Stop & Shop "continuously," and "on a weekly, twice a week basis," requesting Stop & Shop to implement a Telzon ordering system. S & S Tobacco employees even met in person with the Stop & Shop official in charge of its computerized ordering system to discuss the possible implementation of Telzon. Indeed, Stop & Shop employees acknowledged receiving many inquiries from S & S Tobacco concerning Telzon. One, for instance, conceded that S & S Tobacco "was really complaining about the failure to implement Telzon." The District Court did not abuse its discretion in finding that S & S Tobacco had no intention of relinquishing its right to have Stop & Shop transmit cigarette purchase orders by means of a Telzon system.
 
 
 21
 We have reviewed the remaining contentions of the parties and find them to be without merit.