Edward PALMER, et al.,
Plaintiffs–Appellants,

v.

BOARD OF EDUCATION OF COMMUNITY UNIT SCHOOL DISTRICT 201–U, WILL COUNTY, ILLINOIS, et al., Defendants–Appellees.

Nos. 93–3591, 94–1229.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1994.

Decided Feb. 3, 1995.

Forest J. Miles (argued), Richard J. Witry, McCarthy, Duffy, Neidhart & Snakard, Carlton Lowe (argued), Thomas S. Moore, Chicago, IL, for Edward Palmer, Rose Simpson, Jerry Crockett and James Harris, individual-

ly and on behalf of a class of persons similarly situated, plaintiffs-appellants.

Lawrence J. Weiner, John M. Izzo, Anthony G. Scariano, Raymond A. Hauser (argued), Jon Gardner Crawford, Scariano, Kula, Ellch & Himes, Chicago, IL, for Board of Educ. of Community Unit School Dist. 201–U, Will County, IL, Michael E. Stallings, John Ebner, Kenneth D. Schmitt, John W. Ritchie, Randall G. Farmer, Donna L. Swanstrom, Peg Kullio, Bruce Setchell and Jack Slaybaugh.

Jon Gardner Crawford, Scariano, Kula, Ellch & Himes, Stuart D. Gordon, Chicago, IL, for Jan Gould.

Before LAY,* EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

The principal question in this case is whether the suits that produced *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), should have been dismissed as untimely rather than decided on the merits. Some of the states whose laws were at issue had segregated their schools by race since the nineteenth century, but the plaintiffs did not file suit until 1950. If the claim accrued when the discriminatory assignment system came into being, then the suit was far too late. Our case involves a school system that the plaintiffs believe instituted a discriminatory assignment and school closing plan in 1987. They did not file suit until late 1990, and the defendants insist that the suit is untimely. We believe—as the Court assumed in *Brown*—that a claim of racial discrimination arises each day a child is assigned to school under a racially discriminatory policy.

Community Unit School District 201–U comprises all of Monee Township and most of Crete Township in Will County, Illinois. The population of the Village of University Park, in Monee Township, is predominantly black; the population of the rest of the district is predominantly white. Until 1987 the School District operated two junior high schools, one in University Park and the other in Crete. Deer Creek Junior High, in University Park,

is newer, larger, and better equipped. Nonetheless the District closed it and began to bus pupils to the other junior high school. The school board said that the closing was temporary, until renovations could be completed. But renovations have not been scheduled and Deer Creek remains closed. Black children bear a disproportionate burden of transportation. The board says that it lacks the money; plaintiffs say that Deer Creek does not need renovation (the board has never explained what renovations are contemplated) and that the explanation is a pretext for discrimination—that the real reason is the reluctance of white residents to send their children into University Park. Plaintiffs say that this unwillingness also explains the attendance patterns of the district's five elementary schools. One (Hickory) is located in University Park. The district busses pupils out of University Park to the other four schools but no one from the surrounding area into University Park. The district permits parents to choose which elementary school their children will attend; the result is that many white children within Hickory's residence zone attend other schools (even though Hickory is underutilized in comparison to the other four), and no white children from outside Hickory's zone opt in, producing a greater racial imbalance in the schools than in residence patterns. More than 80% of Hickory's pupils are black; the other four schools have a population that is 10% to 39% black. Cf. *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Plaintiffs, a class of black parents and children living in University Park, filed this suit in 1990, and the defendants pleaded the statute of limitations. According to defendants, the time limit of one year began to run when Deer Creek was closed in 1987 and when the attendance rules for elementary schools were adopted, some years ago. Plaintiffs replied that racial discrimination in the operation of the schools is a continuing violation, actionable as long as the discriminatory effects remain, and that at all events the claim did not accrue until 1989 when the

---

* Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

board reneged on a promise to reopen Deer Creek. The district court rejected the continuing-violation theory and, applying a one-year period of limitations, held that the school claims are untimely even if they accrued in 1989. 1991 WL 171342, 1991 U.S. Dist. LEXIS 12130. The court also dismissed several claims of discrimination in the electoral system (we turn to one of these at the end of this opinion) but retained a claim under § 2(b) of the Voting Rights Act, 42 U.S.C. § 1973(b). After additional proceedings the court held that at-large elections to the school board violated § 2(b). It approved a plan creating seven single-member districts. Entry of the permanent injunction under the Voting Rights Act made the dismissal of the other claims final, and plaintiffs appealed.

■ The school discrimination claims depend on 42 U.S.C. § 1983, which obtains its statute of limitations (via 42 U.S.C. § 1988) from state law. In Illinois the period is two years. *Kalimara v. Illinois Department of Corrections,* 879 F.2d 276 (7th Cir.1989). The district court chose a one-year period from 745 ILCS 10/8–101, which applies to tort litigation against municipalities. The school district is a municipal body and therefore, the district court held, is not exposed to suit after a year has passed. Yet *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989), held that there can be only one § 1983 statute of limitations per state—the general law applicable to personal injuries, and not special laws applicable to subsets of personal injuries. See also, e.g., *Anderson v. Romero,* 42 F.3d 1121, 1123 (7th Cir.1994). Recognizing this holding, the Illinois courts have acknowledged that 745 ILCS 10/8–101 may not be employed in § 1983 litigation. *Weiss v. Downers Grove,* 225 Ill.App.3d 466, 167 Ill.Dec. 794, 588 N.E.2d 435 (2d Dist.1992). Statutes such as 745 ILCS 10/8–101 that establish short time limits for suing governmental bodies are especially poor candidates for absorption under § 1988. States are not free to endow themselves and their employees with special protection from § 1983 suits, which after all apply only to state actors. See *Dixon v. Chrans,* 986 F.2d 201 (7th Cir.1993) (holding that states may not modify the tolling rule

for prisoners' suits only when public personnel are defendants, while preserving tolling for suits against private parties). The idea behind *Owens* and *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), is to apply to the states the same periods of limitation that they deem satisfactory for private suits within their borders; states' desire to afford ample opportunities to victims in ordinary private litigation gives vicarious protection to victims of constitutional torts.

To all of this the defendants' principal reply is that the plaintiffs forfeited any application of the two-year period by failing to contest defendants' invocation of 745 ILCS 10/8–101 in the district court. Actually plaintiffs did make the right arguments, but only after the district court had eliminated the school discrimination claims from the case. Because the litigation was ongoing when plaintiffs presented their arguments to the district court, our case is a far cry from *Deppe v. Tripp,* 863 F.2d 1356, 1361–62 (7th Cir.1988), which held that litigants who fail to make accurate objections to jury instructions in civil cases may not invoke the plain error doctrine on appeal. The school counts were dismissed under Fed.R.Civ.P. 12(b)(6), and when acting on a motion to dismiss the district court is supposed to indulge all factual and legal possibilities in plaintiffs' favor. See *Bartholet v. Reishauer A.G. (Zürich),* 953 F.2d 1073 (7th Cir.1992). Plaintiffs did not concede that the statute of limitations bars their claims; they simply missed one good argument in support of a legal position they explicitly advanced and developed. A court should apply the right body of law even if the parties fail to cite their best cases. *Elder v. Holloway,* — U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Cf. *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.,* — U.S. ——, —— – ——, 113 S.Ct. 2173, 2177–79, 124 L.Ed.2d 402 (1993); *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 99, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991). The right rule of law here is a two-year period of limitations.

Even the two-year period does not matter if the time has been running since Deer

Creek closed and the school board adopted its assignment rules for elementary schools. So the district court held. The court treated accrual of a claim as a once-and-for-all proposition: passage of time gives the defendant immunity from litigation, even when the plaintiff may have been unaware of, and unaffected by, the defendant's act until years later. A wrongful act does not mark the accrual of a claim, however; the time begins with injury rather than with the act that leads to injury. E.g., *Goodhand v. United States*, 40 F.3d 209 (7th Cir.1994). (If the victim discovers the injury only later, the time may be postponed, but our case does not entail any claim of belated discovery.) An auto manufacturer that makes a defective steering system faces suit if, many years later, the defect causes the car to plunge into a ditch and injure the occupants. Some states have adopted statutes of repose that bar suits some number of years, say 10 or 15, after a product's initial sale, without regard to the time of injury. See also *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (securities litigation). Even these lengthy periods do not set an outer limit to the gap between the negligence and the suit, though, for the design or construction, the negligent event, may long precede the product's sale. No matter. The two-year period applicable to § 1983 litigation in Illinois is one of limitations rather than repose, and so we look for the injury rather than the wrong that produced it.

■ Many of the members of the plaintiff class—all who entered elementary or junior high school during 1988 to 1990—suffered their initial injuries during the two years before the filing of the complaint. That some other pupils, such as those in their third year of elementary school, may have lost the ability to litigate could not justify dismissal of the entire suit. Defendants seem to think that if the period of limitations has expired for *anyone,* then they are immune from litigation. That implies, for example, that if in 1987 the school board had adopted a rule forbidding the employment of black teachers, then a black person who first applied for employment in 1990 would lose under the statute of limitations. Until re-

cently the law of employment discrimination followed such an approach for rules that were integral parts of seniority systems. *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). Because Title VII of the Civil Rights Act protects incumbent employees' rights under seniority systems, the Court held that details of these systems were insulated from challenge by new employees or those newly affected by old rules. *Lorance* is not a satisfactory model for this case: pupils lack any vested interest in their original or current school assignments, and Congress amended Title VII to start the period of limitations with each new injury even when the remedy might curtail other employees' seniority rights. 42 U.S.C. § 2000e–5(e)(2), as amended by Pub.L. 102–166, 105 Stat. 1075 (1991).

It would not be sensible, even if it were possible, to change the student assignment rules for pupils who entered elementary school within the two years before the filing of this suit, while leaving them in place for the rest of the pupils. At all events, children in the third grade when the case began are entitled to be treated as the Constitution directs. Suppose the school board had voted in 1980 to provide white pupils, but not black pupils, with school books. A child whose parents neglected to sue during his first two years in school would not be doomed to another 10 years of education without books. Each time the teacher passed out books to white children while withholding them from blacks would be a new injury and start a new period to sue. That the school district had committed similar wrongs in the past would not give it an easement across the Constitution, allowing it to perpetrate additional wrongs.

Defendants draw an analogy to cases about the termination of employment. In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), for example, the Court held that the clock starts running when a professor is given a terminal contract, even if he has another year of employment to go. Cf. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The premise of these cases is that the employer took one disposi-

tive act. Like punching someone in the nose, this act may lead to injury in the future, but when there is only one wrongful act the claim accrues with the first injury. See *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir.1992); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir.1990). A series of wrongful acts, however, creates a series of claims. A public employer that applies different salary schedules to black and white employees commits a new wrong every pay period, and the fact that the employer has been violating the Constitution for a generation does not permit it to commit fresh violations. *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); cf. *Jones v. Merchants National Bank & Trust Co.*, 42 F.3d 1054, 1058–59 (7th Cir.1994); *Moskowitz v. Purdue University*, 5 F.3d 279 (7th Cir.1993). Just so here. Every fall the school board decides which buildings to use and which children shall be assigned to which schools. If, as plaintiffs believe, the school board's explanation for closing Deer Creek is a pretext for discrimination, then each year's decision to leave the building shuttered is a new violation—as is each assignment plan that compels black pupils to board busses for a distant junior high school that they would not be required to attend if the population of University Park had a lighter complexion.

Because the school claims were dismissed on the pleadings, we have taken plaintiffs' perspective of the events. For all we know, the school district has race-neutral explanations for its decisions. But if as the plaintiffs allege the school board has closed a school and adopted assignment rules because of race, then it has violated the Constitution, *NAACP v. Lansing*, 559 F.2d 1042, 1052 (6th Cir.1977)—and the fact that it is long past time to rectify such discrimination is a reason to put this case on a fast track to decision rather than to dismiss it as filed too late.

■ As we mentioned at the outset of this opinion, plaintiffs' complaint addressed voting as well as education. Plaintiffs prevailed under the Voting Rights Act and obtained an injunction requiring the school district to replace election at large with election from seven single-member districts. Plaintiffs also sought damages on account of a change to the at-large system in 1989. Most voting-rights cases seek equitable relief, but damages too are available for a racially motivated deprivation of the right to vote. *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927). Although all residents of the district were entitled to vote for every position on the school board, there were restrictions on the residence of board members. Until the 1989 elections, no more than three could reside in Monee Township, three in Crete Township, and one in Crete Fractional Township. In 1989 the rule was changed so that each of the three political units could contribute a maximum of three members to the seven-member board. One of the three members elected from Monee Township in 1985 is black. In 1989 this person was defeated by a candidate from Crete Fractional Township, leaving an all-white school board only two of whose members live in Monee Township. It is this change that the plaintiffs say permits them to collect damages under 42 U.S.C. § 1981.

The district court dismissed this claim under Rule 12(b)(6), ruling that § 1981 is concerned exclusively with contracts of employment. For this proposition the court relied on *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The question in *Patterson* was whether § 1981 prohibited a private employer's racially-motivated failure to promote (and ultimate discharge of) an employee. The Court held not, observing that the language of § 1981 is concerned with the making and enforcement of contracts; if the employer breaks a contract, § 1981 requires state courts to be as open to black persons' claims as to white persons' claims—that is, entitles blacks to the state's aid in *enforcing* their contracts—but does not give black employees rights exceeding those that white employees possess under identical circumstances. See also *The Civil Rights Cases*, 109 U.S. 3, 16–17, 3 S.Ct. 18, 25–26, 27 L.Ed. 835 (1883); *Corrigan v. Buckley*, 271 U.S. 323, 331, 46 S.Ct. 521, 524, 70 L.Ed. 969 (1926); *Hurd v. Hodge*, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948). The district court understood *Patterson* to mean that the *only* function of § 1981 is to protect the creation and enforcement of contracts.

But this is not what the statute says. Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This is the original text from the Civil Rights Act of 1866; the Civil Rights Act of 1991 redesignated the 1866 statute as § 1981(a) and added two new subsections, leaving the original language alone. The 1991 Act does not apply retroactively. *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). At all events, the additions made in 1991 would not affect this case.

*Patterson* dealt with the contract language of § 1981 because that was what the plaintiff had relied on; it did not hold—could not possibly have held—that a state is free to tax black citizens at twice the rate of white citizens despite the provision that all persons "shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Cf. *Mahone v. Waddle,* 564 F.2d 1018 (3d Cir.1977).

■ Plaintiffs rely not on the contract language but on the text providing that all persons are entitled to "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens". Actually, plaintiffs prefer to abbreviate the clause, telling us that they are entitled to "the full and equal benefit of all laws". When the residence districts changed, they lost a "benefit"—one of the three representatives from Monee Township—and are entitled, they say, to redress. Redaction makes this claim look much stronger than it is. It is hard to see how any change in the electoral system could deprive black citizens of "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens". Section 1981(a) ensures an equal legal process, not an equal chance at the polls.

We know from *Patterson,* from its predecessors, and from much historical analysis, that § 1981 was designed to remove obstacles to the full participation of blacks in the legal system. See Charles Fairman, VI *History of the Supreme Court of the United States: Reconstruction and Reunion 1864– 88* 1207–60 (1971); Gerhard Casper, *Jones v. Mayer: Clio, Bemused and Confused Muse,* 1968 Sup.Ct.Rev. 89. If the state enforces contracts among white persons, it has to give blacks the same benefit—and in the same way, giving equal damages for equal wrong done. If it affords tort remedies to whites, it must afford equal remedies to blacks. If it prosecutes crimes against whites in order to protect their persons and property, it must prosecute crimes against blacks. And it must use the same rules when assessing "punishment, pains, penalties, taxes, licenses, and exactions of every kind". The law is designed, in contemporary language, to forbid disparate treatment. But the 1989 rules for elections in the school district did not treat black and white citizens differently; there was at most a disparate impact. See *Mescall v. Burrus,* 603 F.2d 1266 (7th Cir. 1979) (lack of intentional discrimination forecloses use of § 1981 to challenge electoral rules of a public pension fund).

Plaintiffs depict the three seats reserved until 1989 for residents of Monee Township as the "representatives" of Monee Township; the other four members "represented" Crete Township. Yet elections were held at large, and it is a premise of at-large systems that every person elected represents the entire district. That is why, the Supreme Court has held, residence districts need not have equal or even comparable populations. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). If 90% of the representatives must come from an area containing 10% of the people, the candidates still get elected only if they please the majority of the entire population. Members who lived in Crete Fractional Township did not

represent Crete Fractional Township; they were elected by, and represented, the whole school district. Plaintiffs' grievance came from the at-large election system; with racial bloc voting (which the district court found existed) the white population could and did elect all seven members. It could have elected seven white members even if all seven seats had been reserved for Monee Township. Whatever one may say about the scope of § 1981(a), it does not condemn at-large voting schemes, let alone prescribe the right borders of residence districts in at-large systems. Thus the district court was right to dismiss the § 1981 claim, although not for the reason the court gave.

One final matter and we are done. The district court dismissed the complaint to the extent it sought relief from the nine individual defendants, observing that "[t]he complaint does not ... say of any defendant, as an individual, that he or she has done something." Nor did it need to. Complaints need not plead facts. Fed.R.Civ.P. 8(a)(2), (e)(1). See *Leatherman v. Tarrant County,* — U.S. —, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Sanjuan v. American Board of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 250–51 (7th Cir.1994); *Reishauer,* 953 F.2d at 1078. But cf. *Kimberlin v. Quinlan,* 6 F.3d 789 (D.C.Cir.1993) (adopting fact-pleading requirements, inconsistent with this circuit's position in *Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir.1991), for constitutional tort litigation), cert. granted, — U.S. —, 115 S.Ct. 929, 130 L.Ed.2d 876 (1995). It is enough to specify the wrong done and leave details to later steps, such as motions for more definite statement, Fed.R.Civ.P. 12(e), and affidavits concerning summary judgment. When a collective body such as a school district takes a complex series of actions over a span of years, it may be difficult to pin down individual responsibility without discovery. If the complaint cannot survive a motion under Rule 12(b)(6) until each person's role is known, however, it may be impossible as a practical matter to obtain complete relief. The school desegregation claim should proceed against all of the original defendants.

The judgment is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.